[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 98 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 99 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 100 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 101 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 102 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 104 
The jurisdiction of the State court is denied upon two grounds: 1. That the national currency act of congress prohibited original jurisdiction, and 2. That the cause has been removed from the State to the federal courts.
The alleged prohibitory statute is the fifty-seventh section of the aforesaid act. 13 Stat. at Large, p. 99, and provides: "That suits, actions and proceedings against any association under this act may be had in any circuit, district or territorial courts held within the district in which such association may be established, or in any State, county or municipal court in the county or city in which said association is located; having jurisdiction in similar cases. Provided, however, that all the proceedings to enjoin the comptroller under this act shall be had in the circuit, district or territorial court of the United States held in the district in which the association is located."
I think the proper construction of this section is to regard the power conferred, of bringing actions against the associations in specified courts, as permissive and not mandatory. The framework of the section implies that intention. The *Page 106 
words "may" and "shall" are both used; the former to confer a privilege, the latter as a mandate. It is presumed that the attention of congress was drawn to the distinction between the ordinary import of the two words, and that they were used with reference to that distinction, and hence that, if it had been designed to limit prosecutions to the specified courts, the same word would have been employed as in limiting a particular proceeding to a specified court.
There are no words of exclusion in the act, and it is a general rule as to jurisdiction, that to confer it upon one court, does not operate to oust other courts before possessing it, for the reason that concurrent jurisdiction is not inconsistent. (2 Hill, 164.) This rule would be specially applicable to the fifty-ninth section of the act of 1863, of which the section in question is an amendment. By that section, suits by and against these associations were authorized to be brought in the circuit and district courts of the United States, without mentioning State courts; and no one, I think, ever supposed that the privilege conferred by that section precluded actions in State courts. There is some force in the argument that the specification of State courts in the act was unnecessary and useless, unless the clause was intended as restrictive; but this is far from conclusive. Words are often used in a statute for the purpose of producing or preventing a particular inference from other words, and sometimes without necessity or pertinency. After authorizing suits in local Federal courts, a similar power in local State courts may have been deemed proper to prevent an inference that jurisdiction was intended to be restricted to the former. At all events, I am unwilling to hold that the jurisdiction of the State courts was intended to be taken away upon doubtful or ambiguous language. Such a construction would enable these associations to delay and defraud their creditors, and produce inconvenience and expense to suitors, involving an amount of injustice which we cannot attribute to the intention of the law-making power. I lay no stress upon the eighth section, because the authority *Page 107 
to sue and be sued conferred by that section confers a corporate attribute and does not relate to jurisdiction.
But if this construction of the act is erroneous, I do not think it competent for congress to deprive the State courts of jurisdiction in all actions against these banking associations. It is proper to observe in the first place that there are no words of exclusion in the Constitution itself. The second section of the third article declares that "the judicial power shallextend to all cases arising under this Constitution, the laws of the United States, and treaties made," etc., and it may well be doubted whether as to such jurisdiction as the State courts before possessed, not relating to subjects growing out of the organization of the government or the specific powers conferred upon it, it was intended to confer by this clause any other than concurrent power. (Federalist, No. 82; 2 Hill, supra.) However this may be, it is clear that the exercise of the power must be confined to the cases to which the judicial power extends, viz., to cases arising under the Constitution, laws or treaties of the United States, and unless it can be established that every possible action is a case arising under the Constitution or laws of the Union, a general prohibition against actions in State courts would be invalid and a restriction to particular courts, equally so. The case of Osborn v. The Bank of the UnitedStates (9 Wheat., 738) is relied upon as authority for the exercise of this power. That was an action in equity, brought by the bank to restrain the officers of the State of Ohio from collecting a penalty imposed by way of a tax in gross, for its continuing to transact business within the State after a certain period. Upon the theory upon which the bank was created as one of the agencies of the government, that was clearly a case to which the judicial power of the Union extended, and it was competent to authorize such an action to be brought in the United States Circuit Court, and the question of jurisdiction might have been disposed of by restricting the act to such cases.
The opinion of Ch. J. MARSHALL goes to the length, however, *Page 108 
of holding that every action which the bank might bring was a case arising under the Constitution and laws of the Union, and this was placed mainly upon the ground that the right to sue depended upon its corporate existence, created by federal power, and that the possibility that this right might be questioned in any suit constituted a case arising under the Constitution and laws of the United States, without regard to the fact whether any such question was raised or not.
As an original question, I should doubt the soundness of this view, and prefer to adopt the views expressed in the dissenting opinion of JOHNSON, J. But the decision is not decisive of the question as presented in this case. It would be an unwarrantable extension of the principle of that case to apply it to every action against a corporation created by congress. Whether a corporation was created by one power or another, is manifestly immaterial in many actions which may be brought against it. The commencement of a suit admits the capacity of the corporation to be sued, and the very first step of the plaintiff may show that no question can arise of federal cognizance. Take, for example, an action to recover money, the complaint alleging that the plaintiff deposited $100 with the bank defendant, which on demand it refused to pay, and issue is joined by a denial that the plaintiff ever deposited the money. Can it be said that this is a case arising under the Constitution and laws of the United States? To regard it as such involves the perversion of legal language. Nor can any reason be assigned why a strained or artificial construction should be adopted for the purpose of depriving State tribunals of their legitimate functions. Under the appellate jurisdiction of the Supreme Court of the United States, which is referable to the same general power as the original jurisdiction, it is well settled that it is not sufficient to show that a question might have arisen unless it is shown that it did in fact arise in the case. (10 Peters, 368; 12 Wheat., 117.) I insist that the possibility of a question does not make a case arising under *Page 109 
federal law, but if it did, in the case supposed and in most others likely to be brought, it is difficult to see how any such question could be raised.
The existence of the corporation is conceded by suing it as such, and the issue made is confined to the fact of receiving the money. This view can work no injustice to these associations nor deprive them of any right to be heard in the United States court if the case is one to which the jurisdiction extends, as the right of removal, both on account of the nature of the case and the condition of citizenship, is secured by various statutes.
The United States Bank was chartered as a fiscal agent of the government, while these associations were created under a supposed power to furnish a national paper currency; but the distinction, so far as it has any bearing upon the present question, is in favor of the jurisdiction of the State courts, and against the power of restriction. Upon all questions respecting State and federal powers, the utmost fairness and forbearance should be exercised in drawing the line between them. There is no antagonism in theory between the two governments, and if each would refrain from the exercise of doubtful powers, no collision would ever occur. While, as we hold, congress did not intend to oust the State courts of jurisdiction by this act, we are confident that no such power has been conferred by the Constitution. If the federal legislature may create corporations for the transaction of the banking business of the country, and confine all legal proceedings by and against them to federal courts, it requires only another step in the same direction to create corporations for the transaction of railroad, telegraph, express and manufacturing business, and thus to usurp control over the whole business of the country and the internal affairs of the States, absorbing the judicial functions of State courts and reducing the States themselves to mere governmental skeletons without power or vitality, a result which no friend of the Constitution or of republican institutions can desire.
The second objection to the jurisdiction of the court is that *Page 110 
the cause was lawfully removed from the State to the Federal court. The removal is claimed to have been effected under the act of March 2d 1867. No order of the State court is necessary, but the removal is effected by a compliance with the statute. The only discretion which the State court can exercise is in respect to the sufficiency of the surety. (5 Blatch., 336; 6 id., 362.)
The counsel for the plaintiff urges three objections to the validity of the removal: 1. That the bank defendant, being an association organized under the national currency act, is not a citizen of Massachusetts within the meaning of the Constitution.
The Federal courts at an early day felt some embarrassment in holding that corporations were entitled to the rights of citizens in suing and being sued, resulting from an opinion then entertained, that corporations could not be regarded as citizens within the meaning of the United States Constitution. The difficulty was at first overcome by holding that the court would look behind the artificial being, to the corporators, and if all of them resided in a different State from the one in which the suit was brought, and where the other party resided, it should be deemed a suit between the corporators and the other party. (3 Cranch, 267; 5 id., 84.) These decisions necessarily involved the fact that all the corporators must reside in one State. (14 Peters, 60.)
But in the case of the L.C. and C.R.R. Co. v. Letson (2 How. U.S.R., 497) this doctrine was modified; and it was decided that a citizen of one State could sue a corporation created by and transacting its business in another State, although some of the members of the corporation were not citizens of that State.
It was stated by Chief Justice TANEY (1 Black, 296) that the decision in the Letson case was based upon the legal presumption that all the members of a corporation are citizens of the State in which alone the corporate body has a legal existence, and that no averment or evidence to the contrary is admissible; and, hence, that a suit by or against a corporation *Page 111 
is a suit by or against citizens of the State which created the corporate body. The same thing had been stated by the same learned judge in 20 How., 232; and is reiterated by BLATCHFORD, J., in M.N. Bank of Chicago v. Baack (reported in 40 How. Pr.R., 409). CATRON, J., in Rundle v. D. and R.C. Co (14 How. U.S.R., 95), states that the Letson case decided that if the president and directors are citizens of the State where the corporation was created, and the other party is a citizen of another State, the Federal courts have jurisdiction; while, inCowles v. Mercer County (7 Wal., 121), the present chief justice states that the decision in the Letson case is "that a corporation created by the laws of a State, and having its place of business within that State, must, for the purposes of suit, be regarded as a citizen, within the meaning of the Constitution, giving jurisdiction founded upon citizenship;" and he adds: "In the case before us the corporators are all citizens of Illinois, and the corporation is liable to suit within the narrowest construction of the Constitution."
With these conflicting views as to the decision in Letson's case, the only safe guide is the opinion pronounced; and, with all due respect, it seems to me that it was intended to decide that corporations are citizens of the States which create them, irrespective of the residence of the corporators; and that the presumption of such residence formerly indulged, and whether regarded as one of fact or law, was intended to be ignored and disregarded. WAYNE, J., in delivering the opinion, declared that the court intended to decide "that a corporation, created by and doing business in a particular State, is to be deemed to all intents and purposes as a person, although an artificial person, an inhabitant of the same State, for the purposes of its incorporation, capable of being treated as a citizen of that State as much as a natural person;" and, in closing his opinion, adds: "We confess our inability to reconcile these qualities of a corporation — residence, habitancy and individuality — with the doctrine that a corporation aggregate cannot be a citizen for the purposes of a suit in *Page 112 
the courts of the United States, unless in consequence of a residence of all its corporators, being of the State in which the suit is brought. When a corporation exercises its powers in the State which chartered it, that is its residence; and such an averment is sufficient to give the circuit courts jurisdiction."
As an original question, it seems clear that the residence and citizenship of a corporation should be determined without regard to the residence of its corporators. No valid reason is perceived for applying the presumption, or, if applied, it furnishes no ground for the doctrine that the suit is by the corporators in their personal capacity. Although they have an interest in the suit, they are not parties in any legal sense, and their interests are merged in the corporate body. But I cannot agree with the counsel for the plaintiff, that if the doctrine of presumption is to be maintained it would not apply to these banking associations. Their location and place of business are fixed by the law of their creation. They are made inhabitants of States for the purposes of taxation, and a majority of their managing officers are required by law to reside in the States of their respective location. I see no reason why this artificial presumption should not as well apply to them as if incorporated by State authority, especially as in this case where a State bank by virtue of the statute was transmuted from a State to a national bank. The day before the change it is admitted that the presumption would apply, while the day after it is insisted that it would not, although the change was in form only and not in substance. Independent of this presumption, these banks should be deemed citizens of the States where by law they are located within this clause of the Constitution, and this does not impair the decisions in this State, holding that they are foreign corporations under our attachment laws, although located here, because these decisions are based upon the statutory definition of foreign corporations.
My opinion is that the bank defendant had a right, as a citizen of another State, to apply for a removal of the suit. (40 How. Pr. R., 409.) *Page 113 
The next objection is that all the defendants residing in Massachusetts did not apply, and that it is not competent for one of several defendants residing in another State to remove a suit. This is the general rule. It was frequently so held under the act of 1789, and I think is the rule under all the acts, except the act of 1866, which expressly provides for a removal by one or more defendants. I think also, although with some doubt, that applications under this act must come under the general rule. This doubt arises from the fact that this act was passed as an amendment to the act of 1866, which provided for a removal by one of several parties, and from the peculiar phraseology of the act, that when a suit is pending "in which there is a controversy," etc., between citizens of different States it may be removed, but although called an amendment to the act of 1866, it provides for a new cause of removal and by either party, and for removing the entire suit, and the word "controversy" should be held coextensive with the whole issue. The general rule that all the parties must join in the application for removal is applicable to applications under this act, but the objection is answered by the exception established to the general rule, which is, that improper, formal or unnecessary parties need not join in the application. (8 Wheat., 451; 5 Cranch, 303; 2 How., 497; 4 J. Chy. R., 94.) There are in this case two actions in one, against different parties, and the actions are united by virtue of a statute of this State. The action is against the bank defendant as the certifier of the check and against the other defendants as drawers. It was unnecessary, and, but for the statute, improper to unite the causes of action in one suit. The defences are distinct and entirely independent of each other, and separate judgments could be entered. It would be unjust to deprive one party of the right of removing his suit, because another action against other parties was allowed to be united in the same suit, and I do not think that a statute of this State can have that effect upon the right of removal by other parties under a Federal law. It is not necessary to determine whether such removal *Page 114 
would carry the suit against the other parties into the Federal court or not. My opinion is that it would not, and that by the removal the action would become severed, one going to the Federal and the other remaining in the State court.
The last objection to the validity of the removal is, that a corporation cannot avail itself of the act of 1867 by reason of its incapacity to make the affidavit required by the act. It is urged by counsel that this act confers upon one party extraordinary power over the litigation, enabling it, by an exparte oath of mere belief of the existence of a fact, which cannot be contradicted, and after having the benefit of all the "law's delay" in the State court, to remove the suit to another court, and that it should be strictly construed, and hence that it should be held to apply to such a party only as is capable of entertaining and expressing a belief, and that the affidavit can in no case be made by any other than the party himself.
There is a difference of opinion among the members of the court upon the point; and upon consultation we have concluded, as probably the most conducive to the interests of both parties in facilitating the final disposition of the case, to sustain the objection and hold that it was not removed.
This brings us to the exceptions at the trial upon the merits. The views expressed by the Supreme Court of the United States in the recent case of Merchants' Bank v. This Same Defendant (10 Wal., 604), and which accord with repeated decisions of this court, render an elaborate discussion unnecessary.
The certification of a check, if written out, would contain a statement that the drawer had funds sufficient to meet it in the bank applicable to its payment, and an agreement on behalf of the bank that these funds should be retained and paid upon the check whenever it was presented. The cashier has a right, by virtue of his office, to make this certificate when the drawer has funds. He is the custodian of the funds of the bank and of the books; he receives money and gives vouchers therefor; and whether upon receiving a check he pays it in money or gives the holder a certificate of deposit *Page 115 
or draft, or a certificate that he will retain sufficient of the money standing to the drawer's credit to pay it when presented, he is in either case acting within the line of his duty and within the scope of the authority which necessarily attaches to his office.
Whether the bank might not restrict this authority, so as to affect the rights of persons having notice, is not material. It is sufficient that the public have a right to regard his authority as coextensive with these duties, and that such authority is inherent in the office. This is substantially conceded by the learned counsel for the appellants, but they insist that the cashier has no power to make the certificate when the drawer has no funds. I agree that he has not, as between him and the bank, and the liability of the bank is not based upon his power to bind them by such a contract without funds, but upon the ground that the bank cannot dispute the fact that there are funds, and hence the contract is enforced as though there were funds to meet it. It follows that a bona fide holder only can enforce the liability against the bank, where the certificate is given in the absence of funds.
The bank having placed the cashier in the position which implies this inherent authority, those who deal with the bank have a right to infer that he possesses it, and although the exercise of it in a given case may not be warranted on account of the existence or non-existence of some extrinsic fact peculiarly within his official knowledge, yet the bank is responsible instead of an innocent party, upon every principle of reason and morality. This principle applies to the ordinary relation of principal and agent, and, a fortiori, when the employment concerns the general public involving extensive commercial transactions. (16 N.Y., 125; Schuyler's Case, 34 N.Y., 30.)Ultra vires cannot be alleged for telling the truth, even by bank officers, nor can they insist upon a falsehood to the injury of one who has confided in their veracity.
The import of a certification and the liability of the bank upon the principle here indicated legally result from the nature of the agreement and the application of well settled *Page 116 
rules of law, and do not depend upon usage or custom. Whether it is competent for banks, by usage or express agreement, to extend their liability so as to include cases where certificates are issued without funds, to the knowledge of the holder, it is unnecessary to determine. SELDEN, J. (in 16 N.Y., 128), expressed the opinion that banks have no power to loan their credit in that form. It is clear, however, that where such a certificate is made without funds, by a cashier in fraud of the rights of the bank, no one but a bona fide holder can enforce it.
It is claimed by the counsel for the appellants that the refusal of the bank defendant to unite with other banks in Boston in the adoption of a custom to receive from each other certified checks in payment for balances and collections, of which the Second National Bank, the agent of the plaintiff's assignors, and who received the check in question, had notice, operated to charge such agent with notice, that the cashier had no authority to certify this particular check, and that the principals, Jay Cooke Co., are chargeable with the knowledge of their agent; and, hence, that the plaintiff, having only their title, is not abona fide holder. Without inquiring whether all these consequences would follow, I am of opinion that the principal proposition is untenable, viz., that notice of the refusal to co-operate with the other banks by the bank defendant operated as a notice of a want of authority by the cashier to certify this check. The proposed custom of settling balances at the clearing house by certified checks, was a clearing house arrangement for the convenience of the banks themselves, and was subject to such restrictions and regulations as they saw fit to impose or adopt; but the refusal of any particular bank to enter into the arrangement would not affect the power of its cashier to certify checks in the ordinary manner when the drawer had funds, nor the liability of the bank to a bona fide holder when he had not.
The most that can be claimed is that the Second National Bank had constructive notice that the defendant refused to approve of the new custom, which was not only confined to *Page 117 
a special purpose, but, for that purpose, contemplated an unqualified contract on the part of the banks consenting to it to be bound by certifications, without regard to the presence of funds, which, if valid, could be enforced as a binding contract in cases where an ordinary certificate could not. The case in 9 Met., 601, was evidently based upon the idea that the liability of banks upon certified checks depended upon usage or custom, and that a teller did not possess the power of a cashier in this respect. The decision was made over twenty years ago, and has not, as I am aware, been repeated by the courts of Massachusetts, although the practice of using certified checks must have prevailed there as elsewhere. It has been repudiated in this and other States, and should not at this day be regarded as the law in Massachusetts, to override a general rule of construction based upon principles of the common law, of universal application.
It is also urged that the court erred in not submitting thebona fides of the plaintiff's title to the jury. Ordinarily the question of good faith is a question of fact for the jury. Perhaps if a specific request to that effect had been made at the trial, it would have been the duty of the court to submit it, although, with the notice relative to the clearing house arrangement out of the way, I am unable to discern a single fact in the case tending to impeach the good faith of the Second National Bank in receiving this check. It was received in part payment for a draft of $150,000 on Mellen, Ward Co., and $100,000 gold certificates which were parted with and delivered at the time; and no fact is disclosed throwing suspicion upon the transaction. But the answer to the position is that no such request was made, nor was the attention of the court called to it.
The first six requests are substantially that, as a matter of law, the cashier had no authority, and that there was no evidence authorizing the jury to infer it. The seventh request relates to the effect of the notice as to the clearing house arrangement, which has been already referred to. The eighth and ninth are that Jay Cooke Co. and the plaintiff are *Page 118 
chargeable with the knowledge of their agent; and the tenth, that the law in New York is not controlling. These requests, and the additional one asking the court to direct a verdict for the defendants, show that the defendants expected and desired the court to dispose of the case as a question of law; and, as they did not ask that any question of fact should be submitted to the jury, the general exception to the direction to find for the plaintiff is not available, upon appeal, to raise the question.
The result involves, evidently, a considerable loss from the wrongful act of the cashier; but in ethics, as well as law, the party who employed him, and clothed him with the power, should suffer the loss rather than the party who parted with his property upon the faith of the proper exercise of the power. Whenever one of two innocent parties must suffer by the acts of the third, he who has enabled such third person to occasion the loss must sustain it. (2 T.R., 70.)
The judgment must be affirmed.
All concur, except ALLEN, J., not voting.
Judgment affirmed.