SAFETY MOTORS, Inc.

v.

ELK HORN BANK & TRUST CO. et al.

Civ. A. No. 554.

United States District Court
W. D. Arkansas,
Hot Springs Division.

Feb. 16, 1954.

Owens, Ehrman & McHaney, Little Rock, Ark., for plaintiff.

Huie & Huie (for Citizens) Arkadelphia, Ark., Lookadoo, Gooch & Lookadoo, (for Elk Horn) Arkadelphia, Ark., for defendants.

JOHN E. MILLER, District Judge.

In order that the issues might be clearly presented, the Court will first state the substance of the pleadings filed in this case.

## Complaint

On June 4, 1953, plaintiff filed its complaint against the defendants in which it alleged:

That plaintiff is an Illinois corporation engaged in the business of selling automobiles. Defendant, Elk Horn Bank and Trust Company, hereinafter referred to as "Elk Horn," is an Arkansas state banking corporation; defendant, Citizens National Bank, hereinafter referred to as "Citizens", is a national banking corporation; and both defendants have their principal places of business in Arkadelphia, Arkansas.

"During May, June and July, 1950, plaintiff delivered possession in Chicago, Illinois, of certain automobiles to J. R. Shepherd, d/b/a Shepherd Motor Co., of Arkadelphia, Arkansas, against sight bank drafts payable to the order of plaintiff drawn by Shepherd Motor Co. upon one or the other of defendant banks. * * Title papers to the aforesaid automobiles were attached to the drafts, which were then endorsed by plaintiff and deposited with the Marquette National Bank of Chicago, Illinois. The drafts were forwarded by the latter bank through the Chicago Clearing House and in turn reached The First National Bank of Chicago, which transmitted same to one or the other of defendant banks for accept-

ance and payment. The letters of transmittal from The First National Bank of Chicago, * * * instructed defendant banks in each instance to wire nonpayment of items $1,000 and over and to protest all items over $500. All of said drafts appeared on their face to be foreign bills of exchange."

Between and including the dates of June 26, 1950, and July 6, 1950, First National forwarded eleven drafts drawn upon Elk Horn to said bank for acceptance and payment; these drafts were in the total sum of $12,040.

"Defendant Elk Horn wilfully failed and refused to wire notice of nonpayment of said drafts and to protest same, as instructed by the corresponding bank. Defendant Elk Horn wilfully and knowingly failed and refused to return said drafts within twenty-four (24) hours after receipt or within any reasonable time, but, to the contrary, wrongfully retained said drafts forwarded to it between June 26 and July 3 until on or about July 8, 1950, and wrongfully retained said drafts forwarded to it on July 6 until on or about July 15, 1950."

Upon information and belief plaintiff alleges that Elk Horn, during the time it held said drafts, had sufficient funds of Shepherd Motor Company on deposit to pay said drafts, but wrongfully failed and refused to pay the same.

"The eight drafts forwarded to defendant Elk Horn between June 26 and July 3 were received back from said bank by the corresponding bank on July 10, 1950. Plaintiff inquired of Shepherd Motor Co. as to the reason said drafts had not been honored and was informed that the bank account of Shepherd Motor Co. had been moved to defendant Citizens National Bank and was instructed to change the name of the drawee bank to defendant Citizens. Accordingly, the aforesaid eight drafts were transmitted by the corresponding bank to defendant Citizens on July 12, 1950, for acceptance and payment. The three drafts forwarded to defendant Elk Horn on July 6 were received back from said bank by the cor-

responding bank on July 17 and were, in accordance with the instructions aforesaid, transmitted to defendant Citizens on July 19, 1950."

Between and including the dates of July 15, 1950, and July 31, 1950, First National forwarded to Citizens for acceptance and payment 16 additional drafts in the total sum of $16,709.04, said drafts being drawn upon Citizens and payable to the order of plaintiff.

"Defendant Citizens wilfully failed and refused to wire notice of nonpayment of said drafts and to protest same as instructed by the corresponding bank. Defendant Citizens wilfully and knowingly failed and refused to return said drafts within twenty-four (24) hours after receipt or within any reasonable time, but, to the contrary, wrongfully retained all of the aforesaid drafts until on or about August 5, 1950."

Upon information and belief plaintiff alleges that Citizens had sufficient funds on hand, during said time, to pay said drafts, but wrongfully failed and refused to pay the same.

Plaintiff prays judgment against Elk Horn for $12,040.04, together with interest thereon, and against Citizens for a total of $28,749.04, together with interest thereon.

Answer of Citizens National Bank

On July 11, 1953, defendant Citizens National Bank filed its separate answer in which it admitted the receipt of the drafts in question, but denied that said drafts were forwarded for acceptance and alleged that said drafts were in fact forwarded to it for collection and remittance.

Said defendant denied that it wilfully failed and refused to wire nonpayment of said drafts and to protest same, and alleged that on July 21, 1950, it notified First National that the drafts were drawn against uncollected funds, and on July 25, 1950, again notified it that said drafts were still unpaid; admitted that it did not protest said drafts, but denied that plaintiff was damaged thereby; admitted it did not return the drafts within twenty-four hours after receipt but denied that it did so wilfully and alleged that it returned said drafts within a reasonable time; denied that it was authorized by Shepherd Motor Company to pay said drafts.

Said defendant further alleged that said drafts were secured by automobile title papers attached to the drafts, and "by implied instruction of plaintiff said titles were to be examined by Shepherd Motor Company and payment of draft authorized by Shepherd Motor Company upon approval by it of the title papers attached to drafts; and upon payment of the draft by Shepherd Motor Company, the bank was then authorized to surrender the drafts and the title papers to the Shepherd Motor Company. That these instructions were well known to plaintiff herein. That because of these instructions well known to plaintiff herein it was customary to hold such drafts for a longer period of time than ordinary unsecured commercial paper, and plaintiff by its action agreed to such course of conduct on the part of defendant."

Said defendant also alleged:

That Shepherd Motor Company never approved the titles or authorized payment of said drafts, and within a reasonable time Citizens returned the drafts and title papers to plaintiff; that no act of defendant deprived plaintiff of possession or right to possession of the automobiles.

Shepherd never had sufficient funds in its account to pay all the drafts defendant had received for collection, and Shepherd designated the drafts it desired paid from the funds to its credit.

Many of the drafts received by Citizens were materially altered in that the name of the original drawee had been changed or altered. Said drafts were dated several weeks prior to the time they were forwarded to Citizens, had previously been dishonored, were past due and not negotiable, and plaintiff knew said facts and, if entitled to notice of nonpayment and dishonor, by its action waived its right to such notice.

Plaintiff did not negotiate said drafts within a reasonable time, and transmitted said drafts when it knew that previous drafts were still uncollected and unpaid, and thereby waived any right it may have had to notice of non-payment and dishonor.

That any damage sustained by plaintiff was caused by its own negligence. Plaintiff, as a used car dealer, delivered possession of the automobiles to Shepherd at the time of taking the drafts; that said transaction was not a cash sale, but a credit transaction, "since Plaintiff did not deliver title papers to Shepherd Motor Company but attached same to the drafts, Plaintiff knowing at the time that Shepherd Motor Company would have to make financial arrangements to pay said drafts. Said drafts were made out under Plaintiff's supervision and direction and Plaintiff was to all intents and purposes the drawer of the drafts. It was never Plaintiff's intention that the bank accept the drafts, otherwise it would have made the necessary financial arrangements with the bank and have made the title papers to the bank. On the other hand, the title papers were made to Shepherd Motor Company and it was clearly the intention of the parties that the title papers be surrendered to Shepherd only on payment of the drafts.

Even if the transaction was intended as a cash sale, plaintiff knew, because of former dealings with Shepherd and because the first drafts sent Citizens had been previously dishonored, that the drafts would not be paid promptly, and by continuing to accept the drafts and to turn the automobiles over to Shepherd it was selling the cars on credit and intended to look to Shepherd for its pay.

"When the Plaintiff knew that the drafts were not paid, it was its duty at that time to reclaim the cars and protect itself or to have notified Defendant immediately that it was going to look to the bank for payment, but it did not do this—it elected to proceed against Shepherd, and when it found Shepherd was insolvent and had disposed of the cars, and after the lapse of nearly three years,

it comes into court and elects to try and hold Defendant liable for the purchase price of the cars when it had deliberately turned the cars over to Shepherd and had enabled him or his employees to dispose of same; Plaintiff is now trying to hold an innocent party liable for a loss caused by its own negligence and is now estopped by its conduct from asserting its claim against Defendant, if it ever had a claim. Defendant specifically pleads laches and equitable estoppel."

### Answer of Elk Horn Bank & Trust Company

On July 14, 1953, defendant, Elk Horn Bank & Trust Company, filed its separate answer which contained substantially the same admissions, denials and allegations as were contained in the answer of Citizens. However, in addition to the allegations substantially the same as Citizens' answer, Elk Horn further alleged:

That the drafts sent to Elk Horn were drawn by one Jewel Reynolds and "that this defendant did not know and had no way of knowing at the time these drafts were drawn by Jewel Reynolds whether he was an agent for Shepherd Motor Company and defendant Elk Horn Bank & Trust Company denies that Jewel Reynolds was an agent for Shepherd Motor Company."

That two drafts forwarded to it on June 26, 1950, were dated May 24, 1950, and that more than three years had elapsed from the time of the issuing of these two items before this suit was filed; defendant specifically plead the statute of limitations as to these two items of $1,085 each, or a total of $2,170.

"For several weeks before the 26th day of June, 1950, plaintiff had been sending drafts through Elk Horn Bank & Trust Company and had been notified that Shepherd Motor Company did not have sufficient funds to take up or cash these drafts and the defendant Elk Horn Bank & Trust Company had been instructed by the plaintiff to hold these drafts until Shepherd would have sufficient funds to pay same; defendant Elk

Horn Bank & Trust Company states that in some instances, after obtaining authorization from J. R. Shepherd, they were able to remit and forwarded to The First National Bank of Chicago a remittance, covering the draft, and that some of these drafts were held for several days before the Elk Horn Bank & Trust Company was able to remit on same on account of the condition of the account of Shepherd Motor Company and inability to get authorization from J. R. Shepherd to pay same."

That there was nothing on the drafts or letters of transmittal to indicate that they were cash items, and that plaintiff knew it would be absolutely impossible for defendant Elk Horn to treat said drafts as cash items since they would have to be approved by Shepherd before they could be paid.

Both defendants prayed that the complaint of plantiff be dismissed.

### Amendment to Answer of Citizens

On August 8, 1953, Citizens amended its answer and alleged:

"That on or about the 26th day of July, 1950, C. V. Nichols, vice-president and duly authorized agent of Safety Motors Incorporated called the defendant, Citizens National Bank, on the telephone from Chicago, and spoke to Mr. Edgar Diggs, who was at that time cashier of the Citizens National Bank, and asked Diggs whether the Shepherd Motor Company drafts were still unpaid. Whereupon defendant, Citizens National Bank cashier, Diggs, told plaintiff's agent, Nichols that said drafts were still unpaid and further advised Nichols that due to Shepherd's insolvent condition that he seriously doubted whether the bank would be able to collect said drafts. Whereupon plaintiff's agent, Nichols requested defendant's cashier, Diggs, to retain said drafts and to try to collect same. Defendant's cashier, Diggs, then replied that he would do so and requested Nichols to call the First National Bank of Chicago and advise it that he had requested the defendant bank to hold said drafts and try to collect same. Plaintiff's

agent, Nichols, then replied that he would do so."

Citizens thereafter retained said drafts and tried to collect same, but being unable to do so it returned said drafts to First National on or about August 5, 1950.

On January 20, 1954, both defendants filed another amendment to their answers and alleged:

"That the plaintiff, Safety Motors, Inc., has elected to proceed against Shepherd Motor Co. for its remedy and recovery on the drafts involved in this law suit as evidenced by its filing claim against the bankrupt estate of Shepherd, which claim, to the best of the knowledge and belief of the defendants, has been allowed.

"That by reason of said election of one of two inconsistent remedies, plaintiff thereby disavowed the theory of acceptance upon which the law suit is based, and is therefore barred from bringing this action."

Upon the issues made by the pleadings the case was tried to the court on January 20, 1954. At the trial plaintiff introduced in evidence the ore tenus testimony of Floyd M. Caraway and C. V. Nichols; the depositions of J. Carl Sommer, Gerrit Ruisard and John Cunnea; certain interrogatories propounded by plaintiff to defendants, and answers thereto; along with exhibits to the testimony of the witnesses. Defendants introduced the ore tenus testimony of A. C. Stone, W. P. Jones, Jr., J. R. Shepherd, Cecil Cupp, Jr., Edgar Diggs, and Lawrence E. Powell; the deposition of Miss Lillie Stevens; certain interrogatories propounded to plaintiff and answers thereto; and exhibits to the testimony of the witnesses.

At the conclusion of the trial the case was submitted and taken under consideration and time was allowed the attorneys for the parties in which to file briefs in support of their respective contentions. The briefs have been received, and now the Court, after considering the pleadings, ore tenus testimony of witnesses, depositions, exhibits, interroga-

tories and answers thereto, and briefs of the parties, now makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

Plaintiff, Safety Motors, Inc., is a corporation organized and existing under the laws of the State of Illinois, with its principal office and place of business in Chicago, Illinois, and is a citizen of said state.

Defendant, Elk Horn Bank and Trust Company, hereinafter referred to as Elk Horn, is a state banking corporation organized and existing under the laws of the State of Arkansas. Defendant, Citizens National Bank, hereinafter referred to as Citizens, is a national banking corporation organized and existing under the laws of the United States. Both defendants have their principal offices and places of business in Arkadelphia, Arkansas, and are citizens and residents of the State of Arkansas.

The matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

#### 2.

Plaintiff was in the business of selling new and used motor vehicles, and during the months of May, June, and July, 1950, delivered vehicles, mostly pick up trucks, to J. R. Shepherd, doing business as Shepherd Motor Company, Arkadelphia, Arkansas. Shepherd would contact plaintiff by telephone and they would negotiate concerning the purchase by Shepherd of said vehicles from plaintiff. Then Shepherd would send one or more drivers to plaintiff's place of business in Chicago to obtain possession of the vehicles. At the time possession of the vehicles was surrendered to Shepherd's driver, one of plaintiff's employees would fill out a sight draft drawn upon one of the defendant banks and payable to plaintiff. This draft would be signed by Shepherd's driver and he would then be given possession of the vehicle to transport the same to Shepherd's place of business at Arkadelphia, Arkansas. The drafts which were executed by plaintiff and Shepherd's drivers were all drawn in the same manner, and the following is an example of a draft drawn upon Citizens:

| $1,085.00 | June 30 | 1950 |
|---|---|---|
| | On Sight | Pay to |
| the order of Safety Motors, Inc. | | |
| One Thousand Eighty Five and 00/100 | | Dollars |
| with exchange | | |
| For One Ford Pickup Motor #98RC 386061 | | |
| Value received and charge the same to account of | | |
| To Citizens National Bank | Shepherd Motor Co. | |
| No. Arkadelphia, Ark. | By Walter Gustafson | |

After a draft was executed and the possession of the vehicle delivered to the driver of Shepherd, plaintiff would secure from the State of Illinois a Certificate of Title for the particular vehicle involved. It took several days, and sometimes longer, to secure said titles, and in the meantime Shepherd had possession of the vehicles although title had not passed and he had no valid certificate of title thereto. When the certificate was received, plaintiff would place said certificate of title, along with an invoice and bill of sale, in an envelope, seal the same, and attach the envelope to the draft covering said vehicle. Then, the draft, with envelope attached, was deposited in the Marquette National Bank

of Chicago, Illinois. By handling the drafts in this manner, plaintiff sought to protect itself against loss, i. e., the certificates of title would not be delivered to Shepherd until he paid the draft and plaintiff could repossess the vehicle if said draft was not paid.

As heretofore stated, the drafts were deposited in the Marquette Bank, and the deposit slips in each instance contained the following provisions:

"Notice to Depositors. In Receiving items for deposit or collection, this bank acts only as depositors collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited conditionally and subject to final payment in cash or solvent credits in the event of forwarding of items received for collection to correspondents. * * * This bank * * * may charge back any item at any time before final payment, whether returned or not."

Thus, plaintiff was given immediate credit for the draft, but the amount of the draft would be charged back to its account in the event the draft was not paid by the drawee. After receiving the draft, the Marquette National Bank forwarded it to the First National Bank of Chicago, Illinois, and was likewise given immediate credit for said draft. Then First National would forward said draft to the drawee bank, either Citizens or Elk Horn, along with a letter of transmittal on a form containing the following provisions:

"We enclose for Credit or Remittance the items listed below:

Instructions:
{ Wire (giving name of our endorser) non-payment of items $1,000.00 and over, except those unpaid because of missing or unsatisfactory endorsement.

Protest all items over $500.00 except those bearing on their face this stamp or similar authority of a preceding bank endorser."

The above form, or one similar thereto, may be and often is used by banks for either cash items or collection items.

Apparently, both the Marquette Bank and the First National Bank handled the drafts as "cash items," but when the drafts were received by defendants, each of defendant banks, in accordance with the general custom of banks in that area, handled the drafts as collection items. Reasons given by defendants' employees for handling the drafts as collection items were (1) the bank had no prior authority from Shepherd to honor the signatures appearing on said drafts, and Shepherd would have to approve said signatures; (2) the drafts were payable "on sight", appeared on their face to be drawn with reference to a particular motor vehicle, and therefore should be presented to Shepherd for his approval before payment; (3) the envelopes attached to the drafts evidently contained title papers which Shepherd would want to inspect before approving payment; (4) the letter of transmittal from First National did not specifically provide that the drafts were cash items or were sent for acceptance; (5) Shepherd had previously dishonored drafts and plaintiff knew said drafts could not be paid immediately; that it would not have been responsive to the request for "credit and remittance" on the drafts to have "accepted" said drafts and returned them, without securing payment; (6) defendants had specific instructions from plaintiff to hold said drafts in an effort to secure payment thereon, and (7) eleven of the drafts received by Citizens had been previously dishonored and the drawee's name changed.

Prior to June 26, 1950, another set of eleven drafts drawn upon Elk Horn by

Shepherd, payable to plaintiff, had been paid. All of these drafts were forwarded through Federal Reserve Banks, and all were either paid or returned within twenty four hours in accordance with the regulations of the Federal Reserve System. However, all the drafts forwarded to Elk Horn subsequent to and including the date of June 26, 1950, and particularly the eleven drafts involved herein, were sent directly from First National to Elk Horn and were not sent through a Federal Reserve Bank.

### 3.

On June 26, 1950, First National forwarded to Elk Horn two drafts, each in the sum of $1,085 and in the form above set forth. One of the drafts was dated May 24, 1950, but the date on the other draft has been defaced and cannot be ascertained. These drafts were received by Elk Horn on or about June 28, 1950. On June 30, 1950, drafts in the following amounts were forwarded to Elk Horn: $1,095 dated June 16, 1950; $1,095 dated June 16, 1950; $1,110 dated June 16, 1950; $1.095 dated June 16, 1950; and $1,095 dated June 15, 1950. These drafts were received by Elk Horn on or about July 2, 1950. On July 3, 1950, a draft dated June 15, 1950, in the amount of $1,095 was forwarded by First National to Elk Horn and was received by Elk Horn on or about July 5, 1950. On July 6, 1950, three drafts, each in the sum of $1,095 and dated June 16, 1950, were forwarded by First National to Elk Horn and were received by Elk Horn on or about July 8, 1950. All of these drafts were signed by Jewel Reynolds, but Reynolds did not have authority to draw upon the Shepherd account.

As these drafts were received, Elk Horn presented them to Shepherd for his approval, but Shepherd never authorized payment of the said drafts. Each day, or as often as Shepherd could be contacted, Elk Horn's employees would present these drafts, along with other drafts payable to other car dealers, to Shepherd. If Shepherd had sufficient funds in the account he would select which drafts he wanted paid, and as to the others he would usually state that maybe he could deposit funds the next day to pay them. Shepherd did not request Elk Horn to hold the drafts, but did state that he would take care of the drafts as soon as he could obtain the money. Although Elk Horn requested Shepherd to accept the drafts, he did not authorize payment of them because of insufficient funds. During the time Elk Horn was holding these drafts, Shepherd's average bookkeeping balance with said bank was $5,350, but he actually did not have that much real balance because some of the drafts which he had drawn on other persons, and had received credit for, would have to be charged back to his account when they were not paid. Also, during this time practically the only items paid out of Shepherd's account were small checks.

On July 3, 1950, First National sent Elk Horn a "tracer letter" covering the two drafts sent to Elk Horn on June 26, 1950. Said tracer letter provided:

"On date mentioned below we forwarded you a letter enclosing items as stated, since the letter is still open on our books will you please return this tracer and favor us with a report." Then follows a description of the items and across the letter is typed "If not received wire at once." On July 6 First National sent a similar letter covering the drafts mailed Elk Horn on June 30, 1950, and on July 12, 1950, sent a similar letter covering the drafts mailed on July 6, 1950. On July 6, 1950, First National sent Elk Horn the following telegram:

"No remittance received in payment of our cash letter 6–26 containing two items for $1085.00 each please advise if received by you."

On July 7, 1950, First National sent Elk Horn the following telegram:

"No reply received to our wire of the 6th. Please advise by wire immediately fate of our cash letter 6–26 for $2170.00 also advise if you have received our cash letter of 6–30 containing five items totaling $5,490.00 on Shepherd Motor Co.

No remittance received to cover either letter."

On July 7, 1950, Elk Horn sent the following telegram to First National:

"Returned your cash letter of 6–26 yesterday. Returning today your cash letter of 6–30 and 7–3. Drawn against uncollected funds."

Sometime during the latter part of June, 1950, a representative of plaintiff went to Arkadelphia and conferred with Shepherd concerning the dishonor of his drafts. Shepherd evidently succeeded in convincing said representative of his intention and ability to pay the drafts in due time, and the representative then went to the Elk Horn Bank and discussed the matter with A. C. Stone, Executive Vice President of said Bank. He informed Mr. Stone that he thought Shepherd would make it all right, and asked Stone to work with him and to hold the drafts to give Shepherd an opportunity to pay them.

Elk Horn held the first two drafts, which had been forwarded to it June 26 until July 7, 1950, and the next six drafts, which had been forwarded to it on June 30 and July 3, 1950, until July 7, 1950, at which time they were returned to First National. First National's letter of transmittal dated June 26 was also returned with the notation "Drawn against uncollected funds." The three drafts forwarded to Elk Horn on July 6, 1950, were returned to First National on or about July 15, 1950. Elk Horn did not protest the drafts and apparently did not wire non-payment except on July 7, 1950. Eight days is the longest period of time Elk Horn retained any of the drafts, but all the drafts were held longer than twenty-four hours by Elk Horn.

### 4.

The eight drafts which were returned by Elk Horn to First National on or about July 6 and 7, 1950, were received by First National on July 10 and returned to Marquette Bank on that date. Plaintiff contacted Shepherd and inquired about the dishonor of the drafts.

Shepherd stated that he had transferred his bank account to Citizens and authorized plaintiff to change the name of the drawee bank to Citizens. After changing the drawee bank to Citizens, plaintiff again deposited the drafts in the Marquette Bank which in turn forwarded same to First National, and on July 12, 1950, First National forwarded said drafts to Citizens.

The three drafts returned by Elk Horn to First National on or about July 15 were likewise changed and redeposited by plaintiff and forwarded to Citizens on July 19, 1950.

In addition to the eleven drafts above referred to, sixteen additional drafts drawn on Citizens were forwarded to Citizens by First National. On July 15, 1950, First National forwarded to Citizens the following drafts: five drafts in the amount of $1,085 dated June 30, 1950, and signed by Walter Gustafson; one draft in the amount of $1,050 dated June 30 and signed by Walter Gustafson. On July 18, 1950, First National forwarded to Citizens one draft in the amount of $269.04 dated July 15, 1950, and signed by Eugene Whaley. On July 22, 1950, First National forwarded to Citizens, through the Little Rock Branch of the Federal Reserve Bank of Saint Louis, Missouri, three drafts, each in the amount of $1,085 dated June 30 and signed by Walter Gustafson, and one draft in the amount of $1,065 dated June 30 and signed by Walter Gustafson. Citizens returned these drafts within twenty-four hours after receiving them, and on July 26 the Federal Reserve Bank wired First National as follows: "Returned unpaid. Insufficient funds * *." The said four drafts were received by First National on July 27, returned to Marquette on that date, and on July 29 Marquette returned the said drafts to First National. On July 29 First National again sent the said four drafts to Citizens, but this time the drafts were not sent through a Federal Reserve Bank. On July 31, 1950, First National forwarded to Citizens the following drafts: three drafts in the amount of $1,095 dat-

ed July 12 and signed by Walter Gustafson; one draft for $1,095 dated July 7 and signed by Eugene Whaley; and one draft for $1,265 dated July 12 and signed by Walter Gustafson. Neither Gustafson nor Whaley had authority to draw upon Shepherd's account. Each of the said twenty-seven drafts was received by Citizens on or about two days after it was forwarded by First National. Likewise, each group of drafts was accompanied by a letter of transmittal as set forth in finding of fact number two, but the letters of transmittal dated July 29 and July 31 had the additional notation, "Return at once if unpaid stating reason."

The said twenty-seven drafts were handled by Citizens in practically the same manner as the first eleven drafts were handled by Elk Horn. That is, each day, or as often as Shepherd could be contacted, Citizens' employees would present the drafts to him, along with other drafts payable to other car dealers, and Shepherd, if he had sufficient funds to do so, would select which drafts he wanted paid. Shepherd did not request Citizens to hold the drafts, but did state that he had sufficient drafts out for collection to pay them when collection was effected. Shepherd never accepted the drafts, nor did he in any manner authorize their payment. During the time Citizens was holding these drafts, i. e., July 14 to August 5, 1950, $191,778.72 was the total amount paid out of the Shepherd Motor Company account at Citizens. However, at the beginning and end of each day Shepherd would have a very small balance in the account. In fact, on all the days except five the account was less than $500 and on only two days was it in excess of $1,000 at the end of the day.

Between July 20 and July 24, 1950, First National sent Citizens three tracer letters covering the drafts it had forwarded on July 12, 15, and 18. These tracer letters were on the regular form which stated: "On date mentioned below we forwarded you a letter enclosing items as stated, since the letter is still open on our books will you please return this tracer and favor us with a report." On July 26 First National sent another tracer letter covering the drafts forwarded on July 19, and across this letter was printed the notation "If not received wire". Another tracer letter was sent to Citizens covering the drafts forwarded on July 29, and written on this letter was the notation "Return at once if unpaid, stating reason." Citizens returned First National's tracer letter of July 26 with the notation, "We are holding (unpaid items)" followed by a list of the drafts being held by Citizens. In addition to the tracer letters, First National and Citizens exchanged the following telegrams:

July 20 First National wired Citizens: "No remittance received to cover our cash letters of 7–12 $8755.-00 and 7–15 $6475.00 containing various items drawn on Shepherd Motor Co. Please advise by wire whether received by you and reason for nonpayment if unpaid."

On the same date Citizens replied by wire, "Have been received, Shepherd drafts. Drawn against uncollected funds."

July 25 Citizens again wired First National, "We are still holding Shepherd Motor Co. drafts. Unpaid, insufficient funds."

July 26 First National wired Citizens, "Answering your wire 7–25–50 regarding Shepherd Motor Co. Drafts if still unpaid return at once."

July 31 First National again wired Citizens, "As requested in our Telegram of the 26th. Return at once if still unpaid all Shepherd Motor Co. drafts which you received from us."

On July 26, 1950, a man purporting to be the Vice-President of plaintiff called Mr. Edgar Diggs, then cashier of Citizens, and inquired if the drafts had been paid. After being informed of the nonpayment of the drafts and of the fact that First National had requested the return of the drafts, he asked Diggs the

possibility of them being paid and Diggs stated that it looked impossible. He then asked Diggs to hold the drafts and try to collect them, but did not state any specific length of time for the drafts to be held. Diggs requested him to inform First National that the drafts would be held by Citizens in an effort to collect them. Subsequent to this, Citizens held the drafts until on or about August 5, 1950, and having been unable to collect them, on that date returned said drafts to First National.

Citizens did not protest the drafts and, except for the telegrams sent First National on July 20 and July 25, did not wire nonpayment of said drafts. All the drafts were retained by Citizens for a period of time longer than twenty-four hours, except those sent through the Federal Reserve System, the first group being held approximately twenty-two days and the last group being held approximately three days.

First National received the said twenty-seven drafts from Citizens on August 7 and they were returned to Marquette on August 8, 1950. Marquette had charged back the drafts to plaintiff as follows: fourteen drafts on July 28, which included the eight drafts sent by First National to Citizens on July 12, and the six drafts sent on July 15; four drafts on August 1, which included the three drafts sent by First National to Citizens on July 19 and the one draft sent on July 18; four drafts on August 5, being the four drafts which had been sent by First National to Citizens on July 29; and five drafts on August 7, being the five drafts which had been sent to Citizens on July 31, 1950.

Likewise, First National had charged the drafts back to Marquette as follows: fourteen drafts on July 21; four drafts on July 31; four drafts on August 4; and five drafts on August 7, 1950.

### 5.

Plaintiff also delivered to Shepherd six other vehicles and received drafts therefore, but did not deposit said drafts. Thus, plaintiff did not receive payment for thirty-two vehicles it sold to Shepherd. Subsequent to the dishonor of the twenty-seven drafts heretofore mentioned, plaintiff made an effort to trace the vehicles it had sold to Shepherd. Plaintiff discovered that Shepherd had disposed of the vehicles, and of the total of thirty-two vehicles, only nineteen could be traced and those were all in the possession of bona fide purchasers. None of the vehicles could be repossessed. Thereafter plaintiff filed a claim in the amount of $35,604.04, covering all thirty-two vehicles, against the bankrupt estate of Shepherd, but to date plaintiff has received no payment as a result of said claim.

### 6.

The vehicles for which the twenty-seven drafts were drawn were delivered by plaintiff to Shepherd on the following dates: May 24, two; June 15, two; June 16, seven; June 30, ten; July 7, one; and July 12, four. The six vehicles which were sold by plaintiff to Shepherd, but for which the drafts were not deposited, were sold on the following dates: June 30, one; July 7, two; July 8, two; and July 12, one.

### 7.

The records of this Court show that J. R. Shepherd was adjudicated bankrupt on September 13, 1950, and as heretofore set forth all the drafts were returned by Citizens to First National on August 5, 1950. Plaintiff's first effort to avail itself of its security was during the second week in August, 1950, when John Cunnea, plaintiff's truck manager, and an attorney for plaintiff went to Arkadelphia to repossess the vehicles, but, as stated in finding of fact number five, they ascertained that the vehicles had been disposed of by Shepherd who did not have certificates of title.

Neither of the defendant banks had any information or knowledge that Shepherd was or had disposed of any of the vehicles for which the drafts had been drawn and to which drafts the title papers were attached. On the other hand, both defendants assumed that the vehi-

cles for which the drafts were drawn could not be sold to third parties by Shepherd without his obtaining the title papers, and those papers could have been obtained only by the payment of the drafts.

Neither of the defendant banks had an account with First National, nor did First National have an account with either of the defendants.

The facts and circumstances shown by the testimony convince the Court that the plaintiff knew at the time why the various drafts had not been paid and was entirely satisfied to permit the banks to hold the drafts in the hope that they might be collected. The defendants acted at all times in good faith.

No notice of any kind was given to either of the defendant banks by the plaintiff or anyone else that they expected to hold the banks liable on the drafts until the filing of the instant suit on June 3, 1953, which was almost three years after the transactions had occurred. In the meantime, since no claim had been asserted against the defendants and nothing had been done by anyone to refresh their memory of the details of the transactions, the officials and employees of the banks did not completely and clearly retain in their memory all of the facts about what occurred during the time the drafts were held by the banks. However, Mr. Stone, Executive Vice President of Elk Horn, distinctly remembered that plaintiff was fully advised of all the facts and specifically requested him to do the best he could toward the collection of the drafts.

### 8.

Apparently none of the persons handling the drafts considered the drafts as being sent to either of the defendants for "acceptance." Gerrit Ruisard, cashier at the Marquette Bank, in answer to interrogatories stated that he could not define "acceptance." And, in answer to the question, "Were the drafts in question forwarded by you to First National for acceptance or were they forwarded for collection and payment?", he replied, "Neither; they were listed as cash items." J. Carl Sommer, Assistant Auditor of First National, in answer to interrogatories stated that he could not define "acceptance" and in answer to the question, "State whether the drafts in question were forwarded to Citizens for acceptance, or whether they were forwarded for collection and remittance?", replied that "Our records indicate that these items were forwarded to Citizens 'for credit or remittance.'" John Cunnea, truck manager of plaintiff at the time of these transactions, in answer to the question "After Shepherd's drivers had signed the drafts and you had attached title papers thereto, what did you then do with the drafts?", replied, "Deposited them in Marquette National Bank for collection." And, as heretofore stated, each of the defendants considered the drafts collection items and not items sent for acceptance.

### 9.

It was the custom of both defendant banks to pay demand items in the order in which they were received. However, it was also their custom, as well as the custom of other banks in the area, to handle drafts with papers attached as collection items and not to pay such items without authority of the drawer thereof. It was also customary, particularly with respect to automobile dealers, to permit the drawer to inspect the attached title before authorizing payment on the draft. In banks located in the area and similar in size to the defendant banks, nearly all cash items were handled through the Federal Reserve System, and these items were either paid or returned within twenty-four hours. These banks rarely received cash items from other banks, and when they did the letters of transmittal ordinarily contained specific instructions to that effect.

### Discussion

Plaintiff contends that the instruments involved in this case were actually checks, that they were forwarded to defendant banks for acceptance, and that said banks, by retaining said instruments for a period of time in excess of twenty-

four hours, accepted the checks and became liable thereon.

Defendants contend: (1) the instruments were not legitimate checks or bills of exchange, (2) there must be a wilful refusal to return bills before the drawee is charged with acceptance of same, (3) plaintiff has elected to pursue an inconsistent remedy, (4) plaintiff is estopped from enforcing its claim against defendants, and (5) plaintiff was not damaged by any action or inaction on the part of the defendants.

In the findings of fact the Court, as a matter of terminology, referred to the drafts as being drawn on the defendant banks, in accordance with what appeared on the face of said drafts, but a proper legal designation of the instruments involved herein can only be obtained by an examination of the instruments and a knowledge of the intention of the parties as manifested by their actions with reference to said instruments. If the face of the instruments control, as plaintiff contends, they were merely sight drafts, equivalent to checks, with Shepherd as drawer, defendants as drawees, and plaintiff as payee. Plaintiff's contention in this regard might be meritorious, were the rights of innocent third parties involved, but in the instant case, where only the rights of plaintiff and defendants are concerned, the Court is of the opinion that the conduct of the said parties with respect to the instruments should be considered in determining their intentions and the legal effect of said instruments. By their actions the parties treated, and apparently considered, the instruments as drafts drawn by plaintiff on Shepherd payable at the defendant banks. In the first place, if the instruments were actually checks given by Shepherd in payment for the vehicles, no doubt plaintiff would have deposited them immediately after it received them, and they would have been promptly paid or returned. But, the instruments were not given in final payment for the trucks, since title to said trucks was not to pass until the instruments were paid, and instead of treating the instruments as checks, plaintiff held them for varying periods of time, in some instances as long as a month, until it could obtain Illinois Certificates of Title for the vehicles. Then plaintiff placed the certificate of title and bill of sale in an envelope, attached the envelope to the draft, and deposited the same for collection. Plaintiff contends that the attachment of these items to the instrument has no effect whatsoever upon the instrument itself, but the Court cannot agree with this contention. The drafts were payable "at sight" and on the face of the drafts the motor numbers of the vehicles were written. By forwarding the drafts, with said attachments, to defendant banks plaintiff was in effect instructing the said banks not to deliver said attachments to Shepherd unless and until the drafts were paid. See 9 C.J.S., Banks and Banking, § 241. And, as a result of this transaction defendants became agents of plaintiff for the collection of the drafts. 9 C.J.S., Banks and Banking, § 224. Further evidence that Shepherd, rather than defendants, was actually the drawee of the drafts is the fact that the persons signing said drafts for Shepherd had no authority to draw upon Shepherd's account, and, of necessity Shepherd would have to authorize payment of the drafts. It was also clearly within the contemplation of the parties that Shepherd would have the right to inspect the certificates of title, if he so desired, before authorizing payment of the drafts. If this were not true, there would have been absolutely no reason for attaching said certificates to the drafts—they could and no doubt would have been sent by mail, after payment of the drafts, were it not for the fact that Shepherd might want to inspect the certificates before authorizing payment of the drafts. Plaintiff argues that Shepherd was adequately protected because he had possession of the vehicles, but, he could not sell the vehicles legally until he had the certificates of title and he would not authorize payment of the drafts until he ascertained that he had proper certificates of title. Apparently

he only authorized payment when he had found a purchaser for the vehicle covered by the draft, and to which was attached the certificate of title for the vehicle.

In other words, the Court is convinced that the instruments were actually sight drafts drawn by plaintiff on Shepherd and payable at the defendant banks. Thus, plaintiff was in fact drawer of the drafts and Shepherd was drawee.

The statutes which plaintiff relies upon to establish liability on the part of defendants are as follows:

Section 68–311, Ark.Stats., 1947, Annotated:

"The drawee is allowed twenty-four (24) hours after presentment, in which to decide whether or not he will accept the bill; but the acceptance, if given, dates as of the day of presentation."

Section 68–312, supra:

"Where a drawee to whom a bill is delivered for acceptance destroys the same, or refuses within twenty-four hours after such delivery, or within such other period as the holder may allow, to return the bill accepted or nonaccepted to the holder, he will be deemed to have accepted the same."

■ Undoubtedly these statutes apply only to drawees, and if the Court has correctly construed the instruments as constituting Shepherd the drawee of the drafts, defendants were not drawees and the statutes are inapplicable insofar as they are concerned. The Court is not unaware of the fact that there is some authority to the effect that when a sight draft having the requisites of a check is payable at a bank the bank is actually the drawee thereof and subject to the above-quoted statutes. Mt. Vernon National Bank v. Canby State Bank, 129 Or. 36, 276 P. 262, 263, 63 A.L.R. 1133. But, in that case the person signing the draft had authority to draw upon the bank account, and the Court stated, "When the drawer made this check payable at the Canby State Bank, it was equivalent to an order on that bank to pay the same and charge to its account." Contrarily, in the instant case the persons signing the drafts had no authority to draw upon Shepherd's account and the signing of said drafts did not amount to an order upon the defendant banks to "pay the same and charge to its account." And a factor of equal, if not greater, significance is that in the instant case certificates of title were attached to the drafts whereas in the Canby case there were no attachments.

Even if plaintiff's construction of the instruments were correct, i. e., that they were checks and defendants were drawees, plaintiff would be in no better position. Apparently, as plaintiff contends, the weight of authority favors the rule that the above-quoted statutes are applicable to checks presented for payment. Wisner v. First National Bank, 220 Pa. 21, 68 A. 955, 17 L.R.A., N.S., 1266; 63 A.L.R. 1138–1142. However, the Court has been unable, after considerable research, to find any case where the statutes have been applied to a check, in the form of a sight draft, with certificates of title attached. Moreover, there are well-reasoned authorities supporting the view that the statutes do not apply to sight drafts or checks, even without attachments. First National Bank of Omaha v. Whitmore, 8 Cir., 177 F. 397; First National Bank of Goree v. Talley, 115 Tex. 591, 285 S.W. 612; Womack v. Durrett, Tex.Civ.App., 24 S.W. 2d 463. See also, 63 A.L.R. 1138–1142, supra. In First National Bank of Omaha v. Whitmore, supra, the Court at page 399 of 177 F., said:

"On the deposit slip issued to McWhorter by appellant, when the former was credited with the amount of the drafts by the appellant, is the following statement:

" 'For drafts and checks credited or taken as collections, this bank acts only as agent, and assumes no liability on them, nor on drafts in payment for them.'

"The conclusion is irresistible that the appellant simply took the

drafts for collection; that they were sight drafts, and were delivered to Crandall for payment, and not for acceptance. Presentment for payment and presentment for acceptance are two different acts, well known to the law of negotiable instruments. Presentment for payment cannot be made until the instrument presented for payment is due. Presentment for acceptance must be made before the instrument presented for acceptance is due.

"We do not think that the appellant has brought itself within said section 136, herein quoted, in the particulars specified, and therefore the decree appealed from must be affirmed."

Apparently the Arkansas Supreme Court has not had an occasion to decide the question of whether the statutes apply to instances where checks are presented for payment, as distinguished from acceptance, although the Court has held that payment of a check or sight draft upon a forged or unauthorized endorsement would not amount to an acceptance of said check or draft. State v. Bank of Commerce, 133 Ark. 498, 202 S.W. 834, L.R.A.1918F, 538. And, in the course of the opinion the Court at page 504 of 133 Ark., at page 836 of 202 S.W. quoted the following language from First National Bank of Washington, D. C. v. Whitman, 94 U.S. 343, 24 L.Ed. 229:

" 'It is difficult to construe a payment as an acceptance under any circumstances. The two things are essentially different. One is a promise to perform an act; the other an actual performance.' "

Since the payment of a check does not amount to an acceptance thereof, the Arkansas Supreme Court might well follow First National Bank of Goree v. Talley, supra, and hold that the statutes do not apply to checks presented for payment as were the instruments in the instant case. However, the Court feels that it is unnecessary at this time to determine the Arkansas law in this regard because, assuming that the instruments involved herein were checks and were presented for payment *and* acceptance, nevertheless the Court is of the opinion that under the Arkansas law the conduct of the defendants did not amount to an acceptance of the drafts. In St. Louis Southwestern Railway Co. v. James, 78 Ark. 490, 95 S.W. 804, the Court had under consideration certain orders drawn by the railway company employees upon the company payable to the plaintiff for meals or board due plaintiff by said employees. The defendant railway company had retained some of these orders for periods of time in excess of twenty-four hours with the view of collecting them from future wages of the employees, and the Court, in disposing of plaintiff's contention that defendant had accepted the said orders, beginning at page 492 of 78 Ark., at page 805 of 95 S.W., said:

"Now counsel for plaintiff contends that these orders, being drawn for a specified sum, were bills of exchange within the meaning of our statute (Kirby's Dig. § 507), and that a failure to return the same made the company liable under the following section, towit: 'Every person upon whom a bill of exchange is drawn, and to whom the same may be delivered for acceptance, who shall destroy such bill, or refuse within twenty-four hours after such delivery, or within such times as the holder may allow, to return the bill, accepted or nonaccepted, to the holder, shall be deemed to have accepted the same.' Kirby's Dig. § 500.

"It will be noticed that to make the company liable under this section it must be shown that the orders were destroyed, or that there was a refusal to return the same. A mere neglect or failure to return does not constitute an acceptance under this statute. Statutes similar to this are found in many of the states, and it has been held by courts in several of those states that the

refusal mentioned in the statute 'refers to something of a tortious character, implying an unauthorized conversion of the bill by the drawee.' Matteson v. Moulton, 11 Hun (N.Y.) 268; Matteson v. Moulton, 79 N.Y. 627; Dickinson v. Marsh, 57 Mo. App. 566. As it is not shown that any demand for the return of these orders had ever been made on the company, or that it had ever refused to return the orders, we do not think this statute has any application in this case."

Plaintiff contends that the decision in the James case, supra, is not controlling herein for three reasons. First, plaintiff states that the orders involved in the case were not negotiable instruments. But, in the James case the Court, in meeting the plaintiff's contention, assumed that the orders were bills of exchange and nevertheless held that the statute was inapplicable.

█ Next, plaintiff contends that the discussion by the Court concerning the statute was merely dictum. This Court does not agree that said discussion was dictum, but even if it were this Court would be required to follow said dictum in the absence of a positive decision by the Arkansas Supreme Court to the contrary. Standard Accident Ins. Co. v. Roberts, 8 Cir., 132 F.2d 794, 799.

Finally, plaintiff contends that "this case was decided prior to the adoption of the N.I.L. and is no authority in construing the act." It is true that the Negotiable Instruments Law, as such, was enacted subsequent to the decision in the James case, but it is likewise true that the statute construed by the Court in the James case was practically identical with the statute now relied upon by plaintiff in the instant case, i. e., Section 68–312, Ark.Stats.1947, Annotated, and it seems that the language of the Court in the James case would be equally applicable in the instant case, provided the drafts involved herein were presented for acceptance. See, 3 Ark.Law Review 397, 399. And, there is nothing in the later decisions of the Arkansas Supreme Court to indicate that the enactment of the Negotiable Instruments Law in any way impaired the holding of the Court in the James case. To the contrary, later decisions of the Court apparently recognize the continued validity of the James Case. In Bailey & Co. v. Southwestern Veneer Co., 126 Ark. 257, beginning at page 258, 190 S.W. 430, beginning at page 431, the Court said:

"I. W. Saxon was indebted to appellant in the sum of $84.96, and on the 22d day of March, 1915, gave an order drawn on appellees for said sum in payment of said indebtedness. This order was immediately presented to appellees for acceptance. They did not accept it in writing, but stated to the appellant that the order was all right. Subsequently thereto, and within a few days, they confirmed the oral acceptance of the order over telephone. Later, they refused to pay the order. On the 12th day of April thereafter appellant demanded a return of the order. Appellees stated that the order had been thrown in the waste basket and burned up. The return of the order was refused. * * *

"* * * * if the drawee destroys the bill, he will be deemed to have accepted the same. Section 137, Act 81, Acts of Arkansas, 1913. * *

"An accidental destruction of the bill could not amount to an acceptance, but a willful destruction of the bill would. Under all the circumstances in this case, we are of the opinion that the question of fact as to why the order was destroyed should have been submitted to the jury under proper instructions. Throwing the order in the waste basket and permitting it to burn and refusing to pay it without explanation, after having orally accepted same, indicates a negligent and reckless manner of handling bills of exchange. If willful, then appellee herein became responsible."

It will be noted that the bill in the above case was presented *for acceptance* on March 22, 1915, and that within a few days thereafter appellees, by telephone, confirmed the oral acceptance of the order. No doubt at that time appellees still had possession of the bill and had retained it for longer than twenty-four hours, and, if mere retention were sufficient to charge a drawee with acceptance, it seems that the Court would have so held. Especially is this true in view of the fact that the Court had under consideration the very statute which plaintiff invokes in the instant case, i. e., Section 137, Act 81, Acts of Arkansas, 1913, Section 68–312 Ark.Stats.1947, Annotated. And in this connection, it is also worthy of note that the "acceptance by inaction" question was evidently presented to the Court, because at page 259 of 126 Ark., 190 S.W. 430, in the summary of appellees brief, the contention of appellees is set forth as follows:

"1. The order was not a bill of exchange and its retention was not an implied acceptance. * * * A mere failure to return is not an implied acceptance. * * * Neg. Inst.Law, §§ 132, 133, 137."

Thus, it seems that the Court, impliedly at least, held that mere retention was insufficient to charge the drawee with acceptance, and explicitly held that an accidental destruction of a bill would not amount to an acceptance, although a wilful destruction would be an acceptance under the statute. See also, Bailey & Company v. Southwestern Veneer Co., 136 Ark. 583, 207 S.W. 34; Bailey & Co. v. Loveless, 144 Ark. 168, 222 S.W. 10; Bank of Keo v. Bank of Cabot, 173 Ark. 1008, 294 S.W. 49. (In the latter case, however, the defendant bank was not the drawee of the drafts, although they were payable at said bank.)

Plaintiff relies upon the case of Exchange Bank & Trust Co. v. Arkansas Grain Co., 169 Ark. 1084, 277 S.W. 871, as sustaining its theory of acceptance in the instant case, but, a reading of the case discloses that it is in no wise an authority sustaining plaintiff's contentions

herein. An apt appraisal of the opinion may be found in 3 Ark.Law Review, supra, at page 399, wherein the author said:

"The inclusion of Exchange Bank & Trust Co. v. Arkansas Grain Co. among the 'Notes to Decisions' under Ark.Stats. (1947) sec. 68–312 (NIL sec. 137) is unfortunate, since the 'Note' could be read as indicating the Arkansas Court's approval of something close to the constructive acceptance by inaction doctrine. In fact, that case (1) dealt with an instrument which was neither a bill of exchange nor any other kind of negotiable instrument as defined by the NIL, (2) did not mention what is now Ark.Stats. (1947) sec. 68–312 (NIL sec. 137), and (3) was decided on the rather dubious ground that 'acceptance' by a debtor of his creditor's order to pay the amount of the debt to a designated third party effected an *assignment* of the debt to the third party. * * * *"

From the foregoing authorities it appears to the Court that under the Arkansas law a refusal to return a bill, as contemplated by the statute, means a wilful refusal, and in the instant case there was no such wilful refusal on the part of the defendant banks. It is true that the defendants knowingly retained the drafts for a period of time longer than twenty-four hours, but their action was not "wilful" in the sense contemplated by the statute, as construed by the Arkansas Supreme Court, and, even if the drafts were presented to said defendants for acceptance, their retention of said drafts did not amount to an acceptance thereof.

Furthermore, representatives of plaintiff expressly instructed and authorized each of the defendant banks to hold the drafts in an effort to collect them. There was a conflict in the testimony on this point, but the Court was and is convinced that plaintiff's representatives did specifically authorize defendants to hold the drafts for collection. Desiring as

it did to have the drafts paid, certainly plaintiff wanted to have the drafts available at the banks in the hope that Shepherd would obtain sufficient funds and would authorize payment of said drafts, and the banks were acting in plaintiff's behalf in holding the drafts and attempting to obtain Shepherd's authorization to pay the same. Therefore, even though Section 68–312, Ark.Stats., supra, were otherwise applicable in the instant case, defendants did not violate the statute. That is, the statute provides liability where the drawee "refuses within twenty-four (24) hours after such delivery, *or within such other period as the holder may allow*, to return the bill accepted or nonaccepted to the holder". (Emphasis added.) Since plaintiff requested and authorized defendants to hold the drafts longer than twenty-four hours, defendants' action in so holding the drafts did not subject them to liability under the statute.

Another circumstance leading to the conclusion that plaintiff did not send the drafts for acceptance is the fact that plaintiff requested and received the return of the drafts from both of the defendant banks. If the drafts had been sent for acceptance, and, as plaintiff now contends, accepted by retention for longer than twenty-four hours, plaintiff would not have been entitled to the return of the drafts and would not have desired the same. But, not only did plaintiff obtain the return of the drafts, it also sought to repossess the vehicles and filed its claim against Shepherd's bankrupt estate, and it was not until it appeared that plaintiff would receive only a small portion of its claim against Shepherd that plaintiff conceived the idea of charging defendants as acceptors of the drafts. In other words, it seems that if plaintiff had actually sent the drafts for acceptance, and considered them accepted by defendants, it would have taken action long ago to hold defendants liable as acceptors, and its present attempt to so hold defendants is merely an afterthought.

Even if plaintiff's contention were true, i. e., that the drafts were actually checks and were sent to defendants for acceptance, nevertheless plaintiff could not recover in the instant case because it has heretofore elected to pursue another inconsistent remedy and has waived its right to assert a claim against the defendants.

The rule governing election of remedies in Arkansas is stated in Roy v. Notestine, 216 Ark. 447, at page 451, 226 S.W.2d 66, at page 68, as follows:

"There is some conflict in the authorities as to whether the mere commencement of an action constitutes an irrevocable election to pursue alternative and inconsistent remedies. The rule followed by this court is stated in Belding v. Whittington, 154 Ark. 561, 243 S.W. 808, 810, 26 A.L.R. 107, as follows: 'The doctrine of our own court is in accord with the view that where there has once been an election between alternative and inconsistent remedies not occasioned by a mistake or ignorance of material facts, but as the result of a deliberate choice of election between the two, the party making such choice cannot afterwards recant, dismiss his pending action and invoke another remedy in the same or a different forum, even though no positive disadvantage or injury has resulted to the other party. We believe the better reason is to hold one to a deliberate choice once made between inconsistent remedies, where that choice involves nothing more than the determination by the party as to which of two remedies will best subserve his purpose. * * *' See also, Annotation 6 A.L.R.2d 31."

See also, State Life Ins. Co. of Indianapolis, Ind. v. Mitchell, 8 Cir., 126 F.2d 867 (setting forth the rule but holding that it was inapplicable in that case); Home Life Insurance Co. v. Arnold, 196 Ark. 1046, 120 S.W.2d 1012; Butler Brothers v. Hames, 193 Ark. 77, 97 S.W.

2d 622; 6 A.L.R.2d 11–82. In Butler Brothers v. Hames, supra, the Court at page 80 of 193 Ark., at page 624 of 97 S.W.2d quoted with approval the following from 20 C.J., p. 9, § 8 (now, 28 C.J.S., Election of Remedies, § 4):

"What remedies are inconsistent with each other so as to require or to constitute an election between them, and what remedies are consistent so as not to require or to constitute an election between them is a matter to be determined by the facts in each case. No arbitrary rule can be enunciated the application of which will constitute a decisive test for all cases. Ordinarily, the question of inconsistency may be determined by a consideration of the relation of the parties with reference to the rights sought to be enforced as asserted in the pleadings. * * To make them inconsistent one action must allege what the other denies, or the allegation in one must necessarily repudiate or be repugnant to the other. It is the inconsistency of the demands which makes the election of one remedial right an estoppel against the assertion of the other, and not the fact that the forms of action are different."

The rule requiring election of remedies is applicable in cases involving drafts and checks, as well as in other cases. See, United States Fidelity & Guaranty Co. v. First Nat. Bank in Dallas, Tex., 5 Cir., 172 F.2d 258, 262 (election by drawer-employer to proceed against bonding company rather than drawee bank where bank had paid out money on endorsements of payees forged by employee.); National Surety Co. v. Perth Amboy Trust Co., 3 Cir., 76 F.2d 87; American Insurance Co. v. McGehee Liquor Co., 93 Ark. 62, 124 S.W. 252.

The filing of a claim against a bankrupt's estate is a bar to the subsequent prosecution of an action based upon an inconsistent remedial right. Weber Showcase & Fixture Co., Inc., v. Waugh, D.C.Wash., 42 F.2d 515, 520; Boeing Airplane Co. v. Aeronautical Industrial Dist. etc., D.C.Wash., 91 F.Supp. 596, 612, affirmed in 9 Cir., 188 F.2d 356; 28 C.J.S., Election of Remedies, § 16, p. 1092. See also, In re Inland Gas Corp., D.C.Ky., 92 F.Supp. 810, remanded on other grounds in 6 Cir., 187 F.2d 813; Fuquay v. Desha Bank & Trust Company, 154 Ark. 303, 243 S.W. 849.

And, in the instant case it seems clear that plaintiff made a deliberate election to proceed against Shepherd, thereby waiving any claim it might have against defendants based upon acceptance of the drafts. At the time plaintiff filed its claim against Shepherd's bankrupt estate, it had full knowledge of all the facts and of the possible remedies it might pursue. Plaintiff could (1) prosecute its claim against Shepherd for the purchase price of the trucks, or (2) seek to hold the defendant banks as acceptors of the bills which plaintiff contends were checks. In this connection, plaintiff contends that its remedies were not inconsistent—that Shepherd's liability to it was present aside and apart from the checks. Plaintiff is correct in its statement that "The giving of a draft or bank check by a debtor for the amount of his indebtedness to the payee is not a payment or discharge of the debt, the presumption being that it is accepted on condition that it shall be paid." National Union Fire Insurance Co. v. Want, 181 Ark. 824, 28 S.W.2d 63; 46 Am.Jur., Sales, Section 447, Page 613. But plaintiff either overlooks or ignores the effect of the alleged acceptance of the checks. If, as plaintiff contends, defendants accepted the checks, the drawer, Shepherd, and any endorsers would have been discharged from any liability on said checks. Section 68–405, Ark.Stats.1947, Annotated. It seems to be the universal rule that the acceptance or certification of a check by the drawee at the request of the holder operates as a discharge of the drawer. First National Bank of Washington, D. C., v. Whitman, 94 U.S. 343, 345, 24 L.Ed. 229; Linsky v. United

States, 1 Cir., 6 F.2d 869; Bulliet v. Allegheny Trust Co., 284 Pa. 561, 131 A. 471, 42 A.L.R. 1133, 1137; Minot v. Russ, 156 Mass. 458, 31 N.C. 489, 16 L.R.A. 510, 32 Am.St.Rep. 472; Born v. First National Bank of Indianapolis, 123 Ind. 78, 24 N.E. 173, 7 L.R.A. 442, 18 Am.St. Rep. 312; Haynes Equity Union Exchange v. First Nat. Bank, 63 N.D. 372, 246 N.W. 37; Berg v. Federal Reserve Bank of Minneapolis, 55 N.D. 406, 213 N.W. 963, 87 A.L.R. 442, 444; 52 A.L.R. 994, 1001; 10 C.J.S., § 472(d) Bills and Notes. In Causey v. Eiland, 175 Ark. 929, at page 931, 1 S.W.2d 1008, at page 1010, 56 A.L.R. 529, the Court quoted with approval the following from National Commercial Bank v. Miller, 77 Ala. 168, 54 Am.Rep. 50:

"'A certified check has a distinctive character as a species of commercial paper, the certification constituting a new contract between the holder and the certifying bank. The funds of the drawer are, in legal contemplation, withdrawn from his credit, and appropriated to the *payment of the check,* and the bank becomes the debtor of the holder as for money had and received.'" (Emphasis added.)

In other words, the certification or acceptance of a check, at the request of the holder, amounts to payment of the check insofar as the drawer is concerned. In First National Bank of Washington, D. C., v. Whitman, supra, at page 345 of 94 U.S. the Court said:

"It is not doubted, however, that it is within the power of the bank to render itself liable to the holder and payee of the check. This it may do by a formal acceptance written upon the check, in which case it stands to the holder in the position of a drawer and acceptor of a bill of exchange.
* * *

"It may accomplish the same result by writing upon it the word 'good', or any similar words which indicate a statement by it that the drawer

has funds in a bank applicable to the payment of the check, and that it will so apply them. Cook v. State Bank of Boston, 52 N.Y. 96. And such certificate, it is said, discharges the drawer. *As to him it amounts to a payment."* (Emphasis added.)

And, it has been held that certification is equivalent to payment even though the drawer had no funds in the hands of the drawee at the time of the certification. First National Bank of Detroit v. Currie, 147 Mich. 72, 110 N.W. 499, 9 L.R.A.,N. S., 698, 11 Ann.Cas. 241.

Assuming, as plaintiff contends, that (1) the instruments involved herein were checks, (2) they were sent to the defendants, who were drawees, for acceptance, and (3) they were accepted by defendants as a matter of law, then said acceptance would amount to payment for the vehicles, insofar as Shepherd was concerned, and plaintiff would have no claim whatsoever against Shepherd. Conversely, if plaintiff's claim against Shepherd's bankrupt estate is valid, of necessity the defendants did not accept the checks as contended by plaintiff. Therefore, having a choice of two inconsistent remedies, plaintiff chose to enforce its rights against Shepherd, first by seeking to repossess the trucks, and second by filing a claim against the bankrupt estate of Shepherd. And now, plaintiff's belated effort to hold defendants liable as acceptors of the checks comes too late, and plaintiff is bound by the election it made to seek its retribution from Shepherd.

The application of the election of remedies rule in the instant case is buttressed by the elements of estoppel in pais present herein. That is, plaintiff, by seeking to repossess the vehicles, by filing its claim against Shepherd's bankrupt estate, and by failing to notify defendants that it intended to assert liability against them for acceptance of the drafts, thereby prevented defendants from pursuing its remedies against Shepherd and allowed the memories of de-

fendants' employees to grow dim with respect to the transactions complained of herein. In other words, if plaintiff had notified defendants at the time that it considered them acceptors of the drafts and liable thereon, defendants would have been in a position to assist in or to handle the repossession of the vehicles and to take immediate action in an effort to realize and collect the value of the vehicles from Shepherd. But, when defendants were notified, after a period of almost three years, of their alleged liability, it was too late for them to take any effective action toward the repossession of the vehicles or the collection of the value thereof. And, for that matter, if the vehicles could be traced and repossessed at the present time they would be practically worthless. These are additional reasons for holding plaintiff to the election it made to pursue its remedy against Shepherd.

Although plaintiff, in its complaint, did not allege negligence on the part of defendants, and has made little serious contention in this regard, the Court feels that some discussion on this question is warranted.

Initially it may be noted that any negligence claim plaintiff might have against defendants probably would not be barred by the election of remedies rule, since it seems that a claim against defendants based on negligence would not be inconsistent with a claim against Shepherd for the purchase price of the vehicles.

 The defendants had a duty to exercise due care in attempting to collect on the drafts. Ungerleider v. Citizens Commercial & Savings Bank of Flint, Mich., 6 Cir., 104 F.2d 718; Perry State Bank v. Myers, 159 Ark. 253, 251 S.W. 685. The custom and usage of collecting banks may be considered in determining whether a bank exercised due care under the circumstances. Hicks Company, Ltd. v. Federal Reserve Bank of St. Louis, 174 Ark. 587, 296 S.W. 46; Grower's Marketing Service, Inc. v. Webster & Atlas Nat. Bank of Boston, 318 Mass. 496,

62 N.E.2d 225, 227; Martin v. First Nat. Bank in St. Louis, 358 Mo. 1199, 219 S. W.2d 312, 8 A.L.R.2d 446–449. Cf., Section 68–504, Ark.Stats.1947, Annotated. In the instant case not only did defendants handle the drafts in accordance with the custom and usage of collecting banks in the area, but they also held the drafts at the specific request of plaintiff, so it seems clear that said defendants were not guilty of negligence in the attempted collection of said drafts. And, in any event, plaintiff failed to allege or prove that defendants' action or inaction caused it to suffer any damage. Under the Arkansas law, the liability of a collecting bank for negligence is limited to the damage which such negligence caused, and the plaintiff has the burden of proving the damage. Bank of Keo v. Bank of Cabot, 173 Ark. 1008, 294 S.W. 49; Lister v. First National Bank of Van Buren, 181 Ark. 140, 25 S.W.2d 26. Plaintiff has failed to allege or prove either negligence or damages in the instant case, but on the contrary has shown that the loss it sustained was caused solely by its own action in entrusting Shepherd with possession of the vehicles and then waiting, in some instances, as long as a month before forwarding the drafts for collection, thus allowing Shepherd ample time to dispose of said vehicles.

 It is true that defendants did not immediately notify plaintiff of the non-payment of the drafts, but it is also true that plaintiff's representative had full knowledge of the non-payment and the reason therefor, especially after talking with Shepherd and Stone in the latter part of June, 1950, and defendants' failure to immediately notify plaintiff of non-payment was not negligence under the circumstances. See, Silverforb v. Bank of Nashua, 233 Mo.App. 1239, 128 S.W.2d 1070. This is particularly true in view of the fact that plaintiff requested defendants to hold the drafts in an attempt to collect them, thereby ratifying defendants' action in holding said drafts. See, Second Nation-

al Bank of Baltimore, Maryland v. Bank of Alma, 99 Ark. 386, 393, 138 S.W. 472.

The fact that defendants did not comply explicitly with instructions given them by First National might be very material were this an action by First National against the defendants. But plaintiff, having requested and authorized defendants to hold the drafts for collection, is in no position to assert liability on the part of defendants for failing to follow contrary instructions given them by First National as the forwarding bank.

Suffice it to say that the Court is convinced that under all the facts and circumstances, defendants were not guilty of negligence in the handling of the drafts and plaintiff was not damaged by their conduct in attempting to collect on the drafts.

 Each of the defendants pleaded laches as an affirmative defense to plaintiff's claim. Under the facts in this case, plaintiff's claim doubtlessly would be barred by laches if that doctrine were applicable, but the Court is of the opinion that the doctrine of laches may be asserted as a defense only when the plaintiff is seeking equitable relief. See, Everhart v. State Life Ins. Co., 6 Cir., 154 F.2d 347, 356; State Mut. Life Assur. Co. of Worcester, Mass. v. Heine, 6 Cir., 141 F.2d 741, 744. For that reason plaintiff's claim herein is not barred by laches since it seeks only legal, rather than equitable, relief.

 Defendants also pleaded equitable estoppel as a defense to plaintiff's claim, and it is true that equitable estoppel or estoppel in pais may be pleaded as a defense even though plaintiff is seeking only legal relief. Rogers v. Hill, 217 Ark. 619, 232 S.W.2d 443. But the Court feels that the elements of equitable estoppel herein are primarily pertinent with reference to the question of election of remedies, and the Court

has heretofore mentioned this subject in its discussion of election of remedies.

 The remaining contention of defendants is based upon the maxim that where one of two innocent parties must suffer, the one who put it in the power of a third person to perpetrate the act causing the loss, should suffer said loss. This rule, of course, is followed in Arkansas. Arkansas Power & Light Co. v. Bauer, Pogue & Company, Inc., 194 Ark. 1002, 1005, 110 S.W.2d 529; Commercial Credit Co. v. Hardin, 175 Ark. 811, 814, 300 S.W. 434; Missouri Pacific Railroad Co. v. Bland, 167 Ark. 390, 268 S.W. 22. The Court is of the opinion, however, that the maxim is inapplicable in the instant case. If defendants actually accepted the drafts or were guilty of negligence, they would not be innocent parties and would not be entitled to the benefit of the maxim; conversely, if defendants did not accept the drafts and were not guilty of negligence, they are not liable in any event and have no reason or need to invoke the maxim.

### Conclusions of Law

#### 1.

The Court has jurisdiction of the parties to and the subject matter of this cause of action.

#### 2.

The defendants, Elk Horn Bank & Trust Company, and Citizens National Bank, did not accept the drafts involved herein.

#### 3.

The said defendants were not guilty of negligence in the handling of the drafts.

#### 4.

The plaintiff is not entitled to recover damages of and from the defendants, and the complaint of plaintiff should be dismissed.

A judgment in accordance with the above should be entered.