**SAFETY MOTORS, Inc., Appellant,**

v.

**ELK HORN BANK AND TRUST COM-PANY and Citizens National Bank,**
Appellees.

**No. 15070.**

United States Court of Appeals
Eighth Circuit.

Dec. 21, 1954.

Rehearing Denied Feb. 1, 1955.

James M. McHaney, Little Rock, Ark. (John M. Lofton, Jr., and Owens, Ehrman & McHaney, Little Rock, Ark., were with him on the brief), for appellant.

John H. Lookadoo, Arkadelphia, Ark. (Lookadoo, Gooch & Lookadoo, Arkadelphia, Ark., were with him on the brief), for appellee Elk Horn Bank & Trust Co.

C. R. Huie, Arkadelphia, Ark. (Huie & Huie, Arkadelphia, Ark., were with him on the brief), for appellee Citizens Nat. Bank.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

Appellant Safety Motors, Inc. instituted this action against appellee banks for the recovery of money due on certain drafts alleged to have been accepted by said banks. There was federal jurisdiction because of diversity of citizenship and amount involved. A jury was waived and trial was had to the court. The court rendered judgment against appellant and this appeal followed. The parties will be referred to as they appeared in the court below.

Plaintiff is an Illinois corporation engaged, at the time pertinent herein, in the business of selling new and used cars in and around Chicago. During May, June, and July, 1950, it sold certain vehicles to J. R. Shepherd, doing business as Shepherd Motor Company in Arkadelphia, Arkansas. Negotiations between the parties for the purchase of these vehicles were completed by telephone and Shepherd dispatched drivers to Chicago to return the vehicles to Arkadelphia. Before surrendering possession of a vehicle plaintiff's employee filled out a blank draft which was then signed by Shepherd's driver. These drafts were drawn upon defendant banks and made payable to plaintiff.[1]

After delivery of the vehicle to Shepherd's driver, plaintiff secured a certificate of title from the State of Illinois for the particular vehicle sold. This required several days and sometimes weeks to accomplish. Upon receipt of the certificate of title plaintiff placed it and the bill of sale in a sealed envelope, attached the envelope to the sight draft covering the particular vehicle involved, and deposited the draft with documents so attached in the Marquette National Bank in Chicago, Illinois. Plaintiff was given immediate credit for the amount of the draft but subject to it being later charged back in the event the draft was not paid by the drawee. Marquette National Bank forwarded the draft and attached documents to the First National Bank of Chicago, Illinois, where it was received on the same terms. First National Bank then forwarded the draft and documents to the defendant bank in Arkadelphia, Arkansas, upon which it was drawn, with instructions to wire nonpayment of items $1,000.00 or over and to protest all items over $500.00.

The first two drafts on which recovery is sought in this action were forwarded by First National Bank to defendant Elk Horn Bank and Trust Company on June 26, 1950, and were received by the Elk Horn Bank on or about June 28, 1950. On June 30, July 3, and July 6, 1950, nine other drafts were sent by First National Bank and received by Elk Horn Bank within a day or two after mailing. These eleven drafts, totaling $12,040.00, were presented by Elk Horn Bank to

---

1. The drafts were all drawn in the same manner and the following is an example of one drawn upon defendant Citizens National Bank:

"$1,085.00                                          June 30, 1950

On Sight          Pay to the order of Safety Motors, Inc.,

One Thousand Eighty Five and 00/100 Dollars
                                        with exchange

For One Ford Pickup Motor #98RC386061

Value received and charge the same to account of.

To Citizens National Bank

No. Arkadelphia, Ark.              Shepherd Motor Co.

                                   By Walter Gustafson"

Shepherd for his approval and authorization of payment as they were received. Shepherd did not authorize Elk Horn Bank to pay the drafts nor did he request the bank to hold them but repeatedly told employees of the bank that maybe he could deposit funds the following day to cover the drafts. Elk Horn Bank did not protest the drafts and did not wire First National Bank of nonpayment thereof until July 7, 1950.

Beginning on July 3, 1950, and continuing until July 12, 1950, First National Bank dispatched several "tracer letters" and telegrams to Elk Horn Bank inquiring if the drafts sent on the above-mentioned dates had been received and remittance had thereon. On July 7, 1950, Elk Horn Bank advised First National Bank that it was returning unpaid the first eight drafts received because "drawn against uncollected funds". On July 15, 1950, Elk Horn Bank returned the other three drafts to First National Bank unpaid. Each draft was retained by defendant Elk Horn Bank in excess of twenty-four hours but not exceeding eight days.

Upon the return of the drafts to First National Bank, and thence to Marquette National Bank, plaintiff contacted Shepherd who excused nonpayment by stating that he had transferred his bank account to defendant Citizens National Bank in Arkadelphia, Arkansas, and authorized plaintiff to change the name of the bank on the drafts. Plaintiff redeposited the eleven drafts after changing the name of the bank thereon and defendant Citizens National Bank received them in regular course. In addition, plaintiff deposited sixteen other drafts, totaling $16,709.04, drawn on Citizens National Bank covering purchases of vehicles from plaintiff by Shepherd. These sixteen drafts were forwarded by First National Bank between July 15 and July 30, 1950, and received by defendant Citizens National Bank within a day or two after posting. Citizens National Bank handled the twenty-seven drafts in the same manner as Elk Horn Bank had previously handled the eleven, that is, each

day, or as often as Shepherd could be contacted, the drafts were presented for his approval and authorization of payment. Shepherd never authorized payment of the drafts nor did he request defendant Citizens National Bank to hold them, but stated that he had sufficient drafts out for collection to pay plaintiff when collection thereon was effected. Citizens National Bank did not protest the drafts and, except for telegrams sent First National Bank on July 20, and July 25, 1950, did not wire nonpayment.

Between July 20 and July 31, 1950, First National Bank sent several "tracer letters" and telegrams to Citizens National Bank inquiring if payment was received on the drafts and finally requesting that they be returned if still unpaid. On August 5, 1950, Citizens National Bank returned all the drafts unpaid, having held them for periods varying from three to twenty-two days.

There was also evidence before the trial court that during the latter part of June, 1950, a representative of plaintiff contacted defendant Elk Horn Bank and requested it to hold Shepherd's drafts and try to collect them. Also, defendant Citizens National Bank introduced evidence tending to show that on July 26, 1950, a representative of plaintiff requested it to hold the drafts and attempt to obtain payment thereof.

Plaintiff's efforts to recover the vehicles, after Shepherd's drafts were returned unpaid, were unavailing as Shepherd had succeeded in disposing of them without the certificates of title. Thereafter, Shepherd went into bankruptcy and, although plaintiff filed a claim against the bankrupt estate, at the time of the trial below plaintiff had not received payment on said claim.

Plaintiff's complaint charged joint and several liability against both defendants on eleven drafts and liability against defendant Citizens National Bank only on sixteen drafts. The complaint alleged that defendants had accepted the drafts, and became legally liable therefor, by retaining them longer than twenty-four

hours or any other reasonable time.[2] Defendants separately answered admitting receipt of the drafts and retention thereof for more than twenty-four hours but denied that they thereby became acceptors of and liable for said drafts. The answers also set up several other affirmative defenses to plaintiff's claims. At the conclusion of the trial the court made its Findings of Fact and Conclusions of Law and entered judgment for the defendants. In a comprehensive discussion of the evidence and the Arkansas law applicable thereto, the trial court concluded that plaintiff was not entitled to recover for several reasons, which may be summarized as follows: (1). Sections 136 and 137 of the Negotiable Instruments Law, Ark.Stats. 1947, sections 68–311, 312, are not applicable because the evidence established that Shepherd was in fact the drawee of the drafts and defendant banks were agents of the plaintiff for collection only. (2). Even assuming that defendants were the drawees of the drafts and retained them over twenty-four hours, they did not thereby become acceptors thereof since "under the Arkansas law a refusal to return a bill, as contemplated by the statute, means a wilful refusal, and in the instant case there was no such wilful refusal on the part of the defendant banks." (3). Even though section 137 of the Negotiable Instruments Law were otherwise applicable, there was no violation thereof because "representatives of plaintiff expressly instructed and authorized each of the defendant banks to hold the drafts in an effort to collect them." (4). Plaintiff elected to pursue an inconsistent remedy "first by seeking to repossess the trucks, and second by filing a claim against the bankrupt estate of Shepherd" and is therefore precluded from holding the defendant banks liable as acceptors of the drafts. (5). Defendant banks, as collection agents of plaintiff, were not negligent in attempting to collect payment of the drafts and plaintiff failed to prove any damages resulting from any action or inaction on the part of said banks.

■ Assuming that defendant banks were the drawees of the twenty-seven drafts sued upon and that therefore section 137 of the Negotiable Instruments Law of Arkansas is applicable, we think there is substantial evidence in the record before us to support the trial court's finding of fact that "representatives of plaintiff expressly instructed and authorized each of the defendant banks to hold the drafts in an effort to collect them." If this finding is supported by the evidence then the judgment for the defendants was correct since section 137 provides for liability only where a drawee destroys the bill or "refuses within twenty-four (24) hours after such delivery, *or within such other period as the holder may allow*, to return the bill accepted or nonaccepted to the holder * * *." (Emphasis added.)

Defendant Elk Horn Bank introduced evidence tending to show that in the latter part of June, 1950, plaintiff requested and authorized it to hold the eleven drafts and attempt to collect payment thereof from Shepherd. A. C. Stone, executive vice-president of defendant Elk Horn Bank, testified: "A man purporting to be from Safety Motors came to see me about June 26th or 27th and talked to me about Mr. Shepherd. He first called me from Mr. Shepherd's office and told me he was coming over. I don't remember his name. He gave me a card with his name on it. He told me he had been down visiting

---

**2.** Plaintiff's cause of action was predicated on Sections 136 and 137 of the Negotiable Instruments Law of Arkansas, which provide:

Sec. 136. "The drawee is allowed twenty-four (24) hours after presentment, in which to decide whether or not he will accept the bill; but the acceptance, if given, dates as of the day of presentation." Ark.Stats.1947, Sec. 68–311.

Sec. 137. "Where a drawee to whom a bill is delivered for acceptance destroys the same, or refuses within twenty-four (24) hours after such delivery, or within such other period as the holder may allow, to return the bill accepted or nonaccepted to the holder, he will be deemed to have accepted the same." Ark.Stats.1947, Sec. 68–312.

with Mr. Shepherd and that he thought Mr. Shepherd was going to make it alright, that he might have had a little difficulty in some drafts returned, but he would like for us to work with him and he felt sure he would get out of his debt * * *." On cross-examination Stone testified plaintiff's representative told him to "hold the drafts and present them and try to collect them for him". He further testified that later "Someone from Safety Motors called us and said he [Shepherd] had changed his account over to the Citizens, to please return the drafts, and we did so." Stone's testimony was corroborated by J. R. Shepherd, owner of the Shepherd Motor Company, who testified: "Later in the month of June, 1950, along about the last of the month, a representative of Safety Motors came down and talked to me about the drafts. This was after the telephone call. He talked to me about thirty minutes and then went and talked to Mr. Stone on the telephone and then he went to the Elk Horn Bank. He came back to see me after he went to the bank."

Evidence introduced on behalf of the plaintiff was to the effect that no representative of Safety Motors ever went to Arkadelphia in June of 1950, and that neither of the defendant banks were ever called and requested to hold Shepherd's drafts for collection.

Defendant Citizens National Bank also introduced evidence tending to establish that the drafts were held by it for collection upon the request and authorization of plaintiff. Edgar C. Diggs, a cashier of Citizens National Bank at the time the drafts were received, testified: "The full substance of my telephone conversation with Mr. Nichols [Secretary of Safety Motors] on July 26 was this: He inquired if the drafts we were holding had been paid. I told him they had not been paid and that we had received a telegram from the First National Bank of Chicago requesting their return if unpaid. And he asked me then what the possibility, or what I thought was the possibility, of us being able to secure payment of those drafts, and I told him

at the time that it looked like it would be impossible, from what I knew of his business, for him to pay the drafts. Those along with some others. And that we did at that time have a few drafts of Shepherd Motor Company out for collection. We were handling it on a collection basis. And he asked that we hold them and try to collect them for him." Cecil Cupp, vice-president and cashier of Citizens National Bank, testified that he recalled the cashier commenting about telephone calls from Safety Motors with reference to the Shepherd drafts.

Evidence adduced by plaintiff was in direct conflict with the testimony of Diggs and Cupp. C. V. Nichols testified that on July 26, 1950, he was in Los Angeles, California, and introduced his hotel bill of that date as proof thereof. He denied calling Diggs from Chicago or any other place on that day or any other day. Plaintiff also introduced into evidence a statement of the telephone company showing that no telephone call was made from Safety Motors to defendant Citizens National Bank on July 26, 1950.

Thus it became the function and duty of the trial court, sitting without a jury, to resolve this conflict in the evidence. It chose to believe and give greater credence to defendants' witnesses, as evidenced by its statement that:

"Furthermore, representatives of plaintiff expressly instructed and authorized each of the defendant banks to hold the drafts in an effort to collect them. There was a conflict in the testimony on this point, but the Court was and is convinced that plaintiff's representatives did specifically authorize defendants to hold the drafts for collection. Desiring as it did to have the drafts paid, certainly plaintiff wanted to have the drafts available at the banks in the hope that Shepherd would obtain sufficient funds and would authorize payment of said drafts, and the banks were acting in plaintiff's behalf in holding the drafts and attempting to obtain Shepherd's authorization to pay the same. There-

fore, even though Section 68–312, Ark.Stats., supra, were otherwise applicable in the instant case, defendants did not violate the statute. That is, the statute provides liability where the drawee 'refuses within twenty-four hours after such delivery, *or within such other period as the holder may allow,* to return the bill accepted or nonaccepted to the holder.' (Emphasis added.) Since plaintiff requested and authorized defendants to hold the drafts longer than twenty-four hours, defendants' action in so holding the drafts did not subject them to liability under the statute."

■ Findings of fact may not be set aside on appeal unless clearly erroneous, Rule 52(a), Fed.Rules of Civil Proc., 28 U.S.C.A., and a finding of fact made by the trial court on conflicting evidence cannot be said to be clearly erroneous. Joseph E. Seagram & Sons v. Bynum, 8 Cir., 191 F.2d 5. We conclude, therefore, that the finding of the trial court that plaintiff authorized defendants to hold the drafts for collection is supported by substantial evidence and must be affirmed.

■ It is urged that, even granting plaintiff's authorization given on July 26, 1950, to defendant Citizens National Bank, the bank would still be liable on those drafts received and held for more than twenty-four hours before that date. We think it clear, however, that plaintiff's authorization of July 26th constituted a ratification of Citizens National Bank's previous acts and conduct in holding the drafts.

Concluding, as we have, that the trial court did not err in finding that plaintiff authorized retention of the drafts by defendant banks for collection, it becomes unnecessary to discuss the other grounds of the court's decision in granting judgment for the defendants.

■ The only other point raised by plaintiff is that the court erred in receiving testimony of the custom of banks in and around Arkadelphia, Arkansas, to treat bills of exchange with documents attached as collection items rather than cash items. This testimony was not considered by the trial court in arriving at its conclusion that defendant banks were expressly authorized to hold the drafts for collection. Therefore error, if any, in the admission of this testimony could not have been prejudicial to plaintiff.

The judgment appealed from is affirmed.