**BALSA ECUADOR LUMBER CORPO-
RATION, Plaintiff,**

v.

**SECURITY NATIONAL BANK,
Defendant.**

**Civ. No. 511.**

United States District Court
E. D. North Carolina,
Wilmington Division.
June 4, 1956.

---

Stevens, Burgwin & McGhee, Wilmington, N. C., for plaintiff.

Hogue & Hogue, Wilmington, N. C., for defendant.

GILLIAM, District Judge.

This case was tried without a jury. Jurisdiction is based on diversity of citizenship and an amount in controversy that exceeds $3,000. Balsa Ecuador Lumber Corporation is a New York company. The Security National Bank is a banking corporation chartered by the Federal Government. The Bank's principal office is in Greensboro, North Carolina. Its branch office in Wilmington, North Carolina, became involved in the dispute at hand, which arose under the following circumstances.

The Marine Development Corporation was a business concern with its principal offices in Washington, D. C. in the summer of 1951, the Marine Development Corporation was engaged in a contract to make balsa wood life rafts for the United States Navy. Pursuant to this undertaking the company had opened a branch in Wilmington, North Carolina. W. G. Broadfoot, who then resided in Wilmington, was vice president of the corporation and was in charge of its operations there. He had complete author-

ity to handle all of the company's financial affairs relating to the life raft contract. He could sign checks, notes, or other obligations on the behalf of Marine Development Corporation.

Balsa Ecuador Lumber Corporation supplied Marine with balsa for the rafts. Broadfoot made the purchases for Marine. Sales were made for cash before delivery or on a letter of credit. Julius Marashinsky, a salesman for Ecuador, negotiated the sales for Balsa.

In November 1951, the Pennsylvania Railroad Company made an error that occasioned the difficulties that followed. Ecuador instructed the Railroad to pick up four carloads of balsa lumber on November 23, for shipment to Marine at Wilmington. Balsa sent these instructions to the Railroad on the 15th of November. The Railroad, instead of waiting until the 23rd, as per instructions, shipped the cars four days early on the 19th of November. These arrived in Wilmington before Ecuador received payment for them.

Marashinsky telephoned Broadfoot when the error was discovered. An undetermined portion of the lumber had already been cut and was being processed for making life rafts. Broadfoot confessed Marine's inability to pay for the entire shipment at once. He and Marashinsky discussed the feasibility of placing the remainder to its account in a warehouse operated by Broadfoot in Wilmington, to be checked out to Marine as it was paid for. However, Marashinsky believed that Broadfoot's storage charges were unreasonably high. It was finally agreed that Broadfoot would send a sixty-day trade acceptance.

Broadfoot then sent Ecuador the following letter dated December 4, 1951: "This confirms our telephone conversation this morning with Mr. F. Marashinsky whereby we are to send you a sixty-day Trade Acceptance covering the amount we now owe you.

"Please mail us an itemized statement together with invoices covering the last four cars; and also show the amount of credit we have with you due to over-payment of previous shipments. Immediately upon receipt of the above and our verifying same, we will mail you our Trade Acceptance."

The letter was signed, "Marine Development Corp., Wm. G. Broadfoot, Vice President."

Balsa replied with the following letter.

"December 6th, 1951

"Marine Development Corporation
"1006 Murchison Building
"Wilmington, North Carolina
"Attention—Mr. Wm. G. Broadfoot,
    Vice-President
"Gentlemen:

"In accordance with your letter of December 4th, you will find enclosed our invoice #6145 covering shipment totaling 603 bundles Kiln Dried Balsa Wood with 128,639 bft., Grades AL and NL, and amounting to $13,187.58.

"As you will notice from this invoice, we have deducted from the value of the shipment the sum of $676.41 representing credit on your account in our books resulting from over-payment on previous shipments to you. As per our understanding, we should appreciate receiving your Sixty Day Trade Acceptance for the net amount of our invoice, i. e. $12,-511.17.

"The above-mentioned credit is arrived at as follows: * * *

"As you know, this lumber was loaded from the dock on November 19th, as per enclosed bill of lading, and into cars as follows: * * * which arrived at your plant about ten days ago.

"Looking forward to receiving your Sixty Day Trade Acceptance for $12,511.17 and thanking you in anticipation, we remain, * * *."

Broadfoot had prepared on Marine Development Corporation stationery and

sent to Ecuador the following instrument, entitled a Trade Acceptance:

"December 6, 1951

"To: Marine Development Corporation, P. O. Box 741, Wilmington, N. C.

"On February 7, 1952 pay to the order of Balsa Ecuador Lumber Corp. Twelve Thousand Five Hundred Eleven and 17/100 Dollars ($12,511.17)

"The obligation of the acceptor hereof arises out of the purchase of goods from the drawer. The drawee may accept this bill payable at any bank, banker or trust company in the United States which such drawee may designate.

"Accepted At: Wilmington, North Carolina, on December 6, 1951

"Payable At: Security National Bank

"Bank Location: Wilmington, North Carolina

"Buyer's Signature: Marine Development Corp.

"By Agent or Officer: (s) W. G. Broadfoot, Vice Pres. & Treas."

The Trade Acceptance set out above was received by the plaintiff and was signed "Balsa Ecuador Lumber Corp. by Helen Bases, Sec'y." Ecuador discounted the paper to Amsterdam Overseas Corporation. Amsterdam transmitted via the New York Trust Company to the defendant Security National Bank for collection. Balsa, as it was bound to do by the deposit contract with Amsterdam, repaid the credit allowed on the deposit, when the Marine Development Corporation did not pay the Trade Acceptance at maturity.

There is one question that arises from these transactions on which the evidence is in complete conflict. Did Broadfoot agree to personally endorse the trade acceptance? Marashinsky firmly states in a deposition that Broadfoot did so agree in a telephone conversation that I have already mentioned. Broadfoot, in a deposition, is equally firm in his contention that, though he was bombarded with repeated requests both before and after the endorsed paper was received by Ecuador, he steadfastly refused to personally endorse it.

It is clear that Ecuador took the Trade Acceptance without a personal endorsement and sent it for collection via the Amsterdam Overseas Corporation and the New York Trust Company to the defendant Security National Bank in Wilmington. Balsa's letter that accompanied the paper to Amsterdam included the following language: "As mentioned over the phone for our protection, and yours, we believe it would be preferable that you have the enclosed Trade Acceptance forwarded to the Security National Bank of Wilmington, N. C. and request them to have Mr. W. G. Broadfoot personally endorse same."

Amsterdam forwarded the Trade Acceptance to the New York Trust Company with a letter that included the following:

"We request you kindly to forward said acceptance to the Security National Bank of Wilmington, North Carolina, with the request to obtain the personal endorsement of Mr. William G. Broadfoot. Mr. Broadfoot had agreed with our clients, Balsa Ecuador Lumber Corporation, that he would personally endorse the acceptance of his firm, but he seems to have inadvertently overlooked to do so.

"After the endorsement of Mr. Broadfoot has been obtained we ask you kindly to request the Security National Bank in Wilmington, North Carolina, to hold the acceptance until maturity, February 7, 1952, and to present it for payment at that date. If payment should be refused at maturity, the bank should protest the acceptance, and advise you by wire. If the acceptance is paid upon maturity, airmail remittance of the proceeds will be satisfactory."

The New York Trust Company's letter of transmittal to Security reads as follows:

"Attached you will find our collection 19850, a Trade Acceptance of the Marine Development Corporation, payable at your bank on February 7, 1952, our customer has requested that we forward this Trade Acceptance to you at this time with a request that you obtain the personal endorsement of Mr. Broadfoot. We note he has signed this acceptance for his firm, but, apparently overlooked endorsing the item personally.

"When you have secured this endorsement will you please advise us. Hold the Trade Acceptance until maturity date at which time remit to us for same, if paid. If unpaid, please protest and wire non-payment."

This letter and the Trade Acceptance reached the defendant on about the 21st of December. The letter was filed with routine collection letters. Broadfoot's office was located in the same building with the Bank. He was frequently in the Bank two or three times per day between December 21, 1951, and February 7, 1952, the maturity date of the Trade Acceptance. No effort was made to obtain his endorsement before maturity of the instrument. Neither did the defendant inform its correspondent that Broadfoot's endorsement had not been obtained, though it is well to bear in mind that the ignored instructions were to inform the correspondent when the endorsement was obtained.

On December 24, 1951, Balsa received a check for $5,843.93 from Marine. This was payment in advance for more lumber which was shipped on the 27th of December. On January 18, 1952, Balsa had received two more checks, totaling $1,615, advance payment for more lumber shipped on the 18th of January.

Security notified Marine by mail on January 2, 1952, that the Trade Acceptance was in the Bank awaiting payment on February 7th. Payment was refused at maturity. The next day, February 8th, the Trade Acceptance was returned by mail to the New York Trust Company. Due to the intervening weekend, it was not received until the 11th, at which time an official of the New York Trust Company telephoned the defendant and complained of the failure to follow the instructions included in the letter of transmittal set out above. This was the first inquiry made.

An official of the defendant Bank at this time contacted Broadfoot who refused to endorse or pay the Trade Acceptance himself. It was returned to the defendant and was protested on the 14th day of February. Balsa, the plaintiff, brought suit in the North Carolina Superior Court on February 29th, and attached Marine's account with the defendant Bank. The sum of $4,544.07 was all that Balsa recovered on execution of the judgment it got against Marine for the full amount of the Trade Acceptance.

Marine Development Corporation raised working capital to manufacture the life rafts by getting advances on completed lots of the rafts from the defendant Bank. The defendant would advance Marine 90 percent on the invoices for the completed rafts. The Navy made checks payable to the defendant in accord with the 1940 Assignment of Claims Act, 31 U.S.C.A. § 203. It was stipulated by the plaintiff and the defendant that assignments were valid. On January 28, 1952, the Bank discounted invoices and took demand notes from Marine for $27,500. On the same day the Bank received a check from Marine for $25,010.42 which repaid a loan made to Marine the previous summer. That loan was secured by a deed of trust to real estate owned by Mr. and Mrs. Broadfoot. During the time that the Trade Acceptance remained in the Bank, the Bank also paid other checks presented by other creditors of Marine, including Broadfoot.

In the following discussion I shall employ this terminology.. "Collecting Bank" indicates the one that receives an instrument from the payee. In this case the collecting Bank is the Amsterdam Overseas Corporation. "Correspondent Bank" indicates the one to which an instrument is sent for actual collection. The defendant in this case is the correspondent Bank. An intermediary such as the New York Trust Company I shall call a "forwarding Bank". There is considerable conflict between many of the reported cases in the use of these terms. Particularly is this true of the words "collecting" and "correspondent".

In North Carolina a correspondent Bank is directly responsible to the obligee on an instrument for that Bank's negligence or bad faith upon failure to make the collection. The obligee is presumed to have consented to the appointment of the correspondent as his agent by the collecting Bank. Lawson v. Bank of Bladenboro, 203 N.C. 368, 166 S.E. 177.

An action against a correspondent Bank for negligence in making collection is not inconsistent with an action against the principal obligor on the instrument itself. Safety Motors, Inc., v. Elk Horn Bank & Trust Company, D.C., 118 F. Supp. 872; affirmed, 8 Cir., 217 F.2d 517. I shall now turn to the merits of the plaintiff's action.

It can scarcely be denied that the defendant Security National Bank was negligent in its handling of the transaction. Two responsible officials of the Wilmington branch testified that the request to secure an endorsement was novel, that it should have been directed to an official rather than sent with the instrument, that they had never before encountered such a request, that it was a security transaction rather than a collection transaction. Though I take all of these statements to be true, there is in them no justification for the defendant's ignoring the letter from the New York Trust Company which accompanied the Trade Acceptance to the defendant's collection department.

What then resulted from the defendant's negligence? First, the plaintiff was not informed before maturity of the Trade Acceptance that Broadfoot had not endorsed it. Had the letter come to light and the defendant chosen to decline the request, its duty would have been to inform the New York Trust Company of its decision. However, by the very terms of the letter I would infer, and by the testimony of the plaintiff's Vice-President I know that it was at all times known to the plaintiff that Broadfoot had not signed his Company's Trade Acceptance personally. How was the plaintiff injured by not receiving from the defendant information which it already had from other sources?

Secondly, the defendant did not attempt to get Broadfoot's personal endorsement on the Trade Acceptance. The preponderance of the evidence leads me to find that Broadfoot never agreed to personally endorse the paper. Marashinsky deposed that Broadfoot did agree. This was corroborated on the stand by the plaintiff's Vice-President, who apparently attempted to give an honest account of all that happened. Broadfoot deposed that he never so agreed. This was corroborated on the witness stand by an equally impressive witness. Were this the only evidence, I would be in a quandary. However, certain written evidence convinces me that the plaintiff's witnesses are mistaken. I have previously set out Broadfoot's letter of December 4, 1951, written to confirm the telephone conversation with Marashinsky in which the agreement is alleged to have been made. Also quoted is the letter from the plaintiff to Marine of December 6, 1951. The letter was written by the Secretary of the plaintiff Company. She was fully informed of all the negotiations with Broadfoot. The letter was read and approved by Marashinsky before it was sent to Marine. Neither these letters nor the invoices for the lumber make any

reference to a personal endorsement by Broadfoot.

The plaintiff accepted the paper from Marine as it was written. It was discounted at Amsterdam Overseas Corporation with the mere suggestion that it would be "preferable" to secure Broadfoot's endorsement. In my mind this further weakens the contention that the endorsement had been agreed upon.

The third default resulting from the defendant's negligent handling of the collection letter was that the Trade Acceptance was not protested immediately upon refusal of payment at maturity but several days later, on further instructions from the forwarding Bank. No endorsers were released due to this delay. The principal obligor was not released. A judgment against it was partially satisfied.

As early as 1832, in Stowe v. Bank of Cape Fear, 14 N.C. 408, it was decided that if a Bank is negligent damages are not necessarily the face amount of the bill. The Bank may show that the obligor was insolvent. The burden of proof is upon the proponent to show that it has sustained damage by reason of the Bank's negligence. American National Bank v. Savannah Trust Company, 172 N.C. 344, 90 S.E. 302. In Smith v. Bank of Glade Spring, 12 F.2d 535, 538, the Court of Appeals for this Circuit approved a jury instruction which includes a concise statement of the damage issue in cases of this nature. "The liability above mentioned cannot in any event exceed the actual loss of the plaintiff firm other than such loss as you believe from the evidence the plaintiff would have suffered if the defendant had done all that you believe it should have done." I, as a jury, believe that Balsa Ecuador Lumber Corporation would have suffered no less loss than it has if the defendant had done all that it should have done.

"The course actually pursued by the Bank was not calculated to, and did not in fact, mislead or injure plaintiff in any particular. The Bank had never handled a collection exactly like the one which is the subject of this action. Not only that, but learned counsel have not, nor has the court after diligent research, found a case where the facts were the same as those in the case at bar." Burdick v. Schmitt, 1935, 56 Nev. 229, 48 P.2d 762, at page 765. This language aptly states my conclusion regarding the negligence of the Security National Bank in this case.

In addition to the plaintiff's contention that the defendant is liable for its negligence there is argument that the defendant acted in bad faith or breached a fiduciary relationship for which it would be liable. In particular it is urged that the Bank, as agent, worked against the interest of its principal, the plaintiff, by collecting debts due the Bank, and by not revealing to its principal its role as creditor of the obligor indebted to the principal on the paper held by the agent for collection.

This quotation from Thack v. First National Bank & Trust Company, 5 Cir., 206 F.2d 180, 183, 39 A.L.R.2d 1290, disposes of these contentions. "Although, as collecting agent for the drafts, the appellee bank owed appellants the duty of due diligence, good faith and impartiality, appellee was not necessarily precluded thereby from collecting its own debt by lawful means, so long as it was guilty of no bad faith. It owed appellants no duty to notify them that it was also a creditor of Cockrell (obligor), unless suppression of that fact would amount to bad faith, which, in the circumstances here present, it does not. Having acted in good faith and with due diligence in the performance of its duties as collecting agent, and being unable to pay appellants' drafts because the drawee had not accepted them, appellee was at liberty to apply Cockrell's available funds to the payment of his debt to the bank."

The defendant's lack of due diligence had no effect on the plaintiff's unfortunate loss. The circumstances that I outlined in detail surrounding the Bank's dealings in this transaction do not pre-

sent a situation that is even indicative of any bad faith.

In accord with the foregoing decision, it will be ordered, adjudged and decreed that the plaintiff, Balsa Ecuador Lumber Corporation, recover of the defendant, Security National Bank, the sum of $1. The defendant is to bear the plaintiff's costs in bringing this action.